Marion E. Lachs, Respondent, *v.* Fidelity & Casualty Company of New York, Appellant.

Argued October 7, 1953; decided March 4, 1954.

*Henry J. Bogatko, Archie M. Stevenson* and *William M. Keegan* for appellant. I. Defendant's insurance policy in clear and unambiguous language provided that it covered only flights by scheduled airlines. Sadie Bernstein at the time of her death was not on a flight by a scheduled airline. (*Metzger* v. *Aetna Ins. Co.*, 227 N. Y. 411; *Matter of Level Export Corp.* [*Wolz, Aiken & Co.*], 305 N. Y. 82; *Slater* v. *Fidelity & Cas. Co. of N. Y.*, 277 App. Div. 79; *Putnam* v. *Air Transport Assn. of America*, 112 F. Supp. 885; *Apgar Travel Agency* v. *International Air Transport Assn.*, 107 F. Supp. 706; *United States* v. *Eagle Star Ins. Co.*, 196 F. 2d 317; *S. S. W., Inc.,* v. *Air Transport Assn. of America*, 191 F. 2d 658; *New England Air Express* v. *Civil Aeronautics Bd.*, 194 F. 2d 894; *Weinberg & Holman* v. *Providence Washington Ins. Co.*, 254 N. Y. 387; *Kean* v. *National Sur. Co.*, 241 N. Y. 252; *Rosenthal* v. *American Bonding Co.*, 207 N. Y. 162; *Royster Guano Co.* v. *Globe & Rutgers Fire Ins. Co.*, 252 N. Y. 75.) II. As the provisions of the policy are clear and unambiguous, no proof of surrounding circumstances or other extrinsic aids to interpretation are material or necessary for

the construction of the policy sued upon. (*Brainard* v. *New York Central R. R. Co.*, 242 N. Y. 125; *Matter of Davis* v. *Block & Smith*, 297 N. Y. 20.) III. The policy is not ambiguous. (*Houlihan* v. *Preferred Acc. Ins. Co.*, 196 N. Y. 337; *Gorman* v. *Fidelity & Cas. Co. of N. Y.*, 55 F. 2d 4.) IV. Where, as in the present case, no disputed issues of fact exist, it was error to deny defendant's motion for summary judgment. (*Brady* v. *Cassidy*, 104 N. Y. 147.)

*A. David Rosen* and *Meyer Licht* for respondent. I. The coverage clause of the insurance contract is not clear and unambiguous. It is susceptible of varying interpretations. (*Weisman* v. *Guardian Life Ins. Co. of America*, 273 App. Div. 761; *United States* v. *California*, 297 U. S. 175; *Fordham Bus Corp.* v. *United States*, 41 F. Supp. 712; *McGogney* v. *Mutual Life Ins. Co. of N. Y.*, 103 F. 2d 649; *Houlihan* v. *Preferred Acc. Ins. Co.*, 196 N. Y. 337; *Hartol Products Corp.* v. *Prudential Ins. Co. of America*, 290 N. Y. 44; *McMasters* v. *New York Life Ins. Co.*, 183 U. S. 25; *Rappaport* v. *Phil Gottlieb-Sattler, Inc.*, 280 App. Div. 424; *Matter of Western Union Tel. Co.* [*ACA*], 299 N. Y. 177.) II. Where ambiguity exists in the terms of the contract and triable issues of fact arise, a motion for summary judgment must be denied. Where the insurance policy is ambiguous, that construction of the policy will be adopted which is most favorable to the insured. (*Mutual Life Ins. Co.* v. *Hurni Packing Co.*, 263 U. S. 167; *Killian* v. *Metropolitan Life Ins. Co.*, 251 N. Y. 44; *Kocak* v. *Metropolitan Life Ins. Co.*, 237 App. Div. 780, 263 N. Y. 518; *Marcus* v. *United States Cas. Co.*, 249 N. Y. 21; *Janneck* v. *Metropolitan Life Ins. Co.*, 162 N. Y. 574.) III. A motion for summary judgment must be denied where triable issues exist meriting a trial. (*Brawer* v. *Mendelson Bros. Factors*, 262 N. Y. 53; *Piedmont Hotel Co.* v. *Nettleton Co.*, 263 N. Y. 25; *Quinn* v. *Metropolitan Life Ins. Co.*, 187 Misc. 629; *Horby Realty Corp* v. *Yarmouth Land Corp.*, 270 App. Div. 696; *Di Menna & Sons* v. *City of New York*, 301 N. Y. 118; *Esteve* v. *Abad*, 271 App. Div. 725; *Dunckel* v. *Parsons*, 274 App. Div. 539, 301 N. Y. 572; *Kenyon* v. *Knights Templar & Masonic Mut. Aid Assn.*, 122 N. Y. 247.) IV. The loss of life of Sadie Bernstein was covered by the policy. (*Civil Aeronautics Bd.* v. *Modern Air Transport*, 179 F. 2d 622.)

CONWAY, J. This is a motion by defendant insurance company for summary judgment in an action by the daughter beneficiary named in an airplane trip insurance contract. Special Term denied the motion and the Appellate Division affirmed, ruling that "the language of the coverage was not so plain and unmistakably clear as to compel dismissal of the complaint as a matter of law on the merits and the granting of summary judgment in defendant's favor." (281 App. Div. 633, 635.) The Appellate Division granted leave to appeal upon two certified questions.

There are some undisputed facts. Thus, it is clear that the day before her death, the decedent, a resident of New York City, visited a tourist agency in New York City and made arrangements to fly on the following day to Miami, Florida. She received an "exchange order" which she brought to Newark Airport at 8:00 A.M. on the following morning. She purchased "AIRLINE TRIP INSURANCE" in the sum of $25,000 from an automatic vending machine. She then went to the Consolidated Air Service counter and completed her flight arrangements, with one McManus of the agency, to fly to Miami on a Miami Airline, Inc., plane and mentioned to him her purchase of the insurance and her hopes for a good flight. She later entered the plane, after a delay, the reason for which is not disclosed in the record, and in less than an hour was dead as the result of a crash.

Plaintiff claims that the vending machine was situated in front of the Consolidated Air Service counter at which decedent obtained her transportation ticket. Pictures of the machine and affidavits indicate that in letters ten times larger than any other words on the machine and in prominent lighting, appeared the words "AIRLINE TRIP INSURANCE". Over those words was a well-illuminated display of airplanes flying round and round, and in large characters appeared the words and numerals "25¢ For Each $5,000 Maximum $25,000". Below that on a placard, in letters *many times* the size of the other words thereon, we find:

" ' DOMESTIC '
AIRLINE TRIP INSURANCE
25¢ FOR EACH $5,000        MAXIMUM $25,000 ".

Below in *much smaller print* on the same placard appears:

" Covers first one-way flight shown on application (also return flight if round trip airline ticket purchased) completed in 12 months within or between United States, Alaska, Hawaii or Canada or between any point therein and any point in Mexico, Bermuda or West Indies on any scheduled airline. Policy void outside above limits. For ' international ' coverage see airline agent."

The application mentioned on the placard is obtained by inserting 25¢ in a slot for each $5,000 of insurance desired. Upon such insertion, a small slot of approximately one inch opens and the application for insurance is presented. It reads as follows:

" I hereby apply to Company named below for Airline Trip Insurance to insure me on one Airline trip between: Point of Departure?......Destination?......And return......Beneficiary's home?......Beneficiary's Street Address?......Beneficiary's City?........Beneficiary's State?........Name of Applicant (please print) Signature of Applicant ".

Upon completion of the application, the applicant presses a button and there comes from the machine a policy of insurance. The policy is approximately eleven inches in height and is printed on both sides — thus there are twenty-two inches of printed matter. However, the purchaser does find across the front of the policy in type *many times larger* than all the other printing on the page and obliterating some words of the policy: " THIS POLICY IS LIMITED TO AIRCRAFT ACCIDENTS READ IT CAREFULLY ". There is also an envelope in the machine to mail to the beneficiary, for the insured is not expected to read the policy on the plane. The envelope has printed on it: " AIRLINE TRIP INSURANCE ".

Plaintiff says that some but not all machines have a specimen policy attached and that it has not been established that the machine from which decedent purchased her policy had a specimen attached. Be that as it may, the defendant has presented

as an exhibit a specimen policy and the words quoted (*supra*):
" THIS POLICY IS LIMITED TO AIRCRAFT ACCIDENTS READ IT CAREFULLY " obliterate the words: " Civilian Scheduled Airline " in the coverage clause so that they cannot be read.

This was the " coverage " clause in the policy on page 1: " This insurance shall apply only to such injuries sustained following the purchase by or for the Insured of a transportation ticket from   *   *   *   a Scheduled Airline during any portion of the first one way or round airline trip covered by such transportation ticket   *   *   *   in consequence of: (a) boarding, riding as a passenger in, alighting from or coming in contact with any aircraft operated on a regular or special or chartered flight by a Civilian Scheduled Airline maintaining regular, published schedules and licensed for interstate, intrastate or international transportation of passengers by the Governmental Authority having jurisdiction over Civil Aviation   *   *   *."

Defendant on its part points to the fact that there was hanging on the wall at the right hand end of the counter where decedent picked up her ticket, a fairly large sign — approximately three feet by four feet — bearing the caption in large size capital letters:

" NON SCHEDULED AIR CARRIERS
AUTHORIZED TO CONDUCT BUSINESS
IN THIS TERMINAL "

and that there followed a list of ten carriers, among which was included on a separate line,

" MIAMI AIRLINE ".

In answer, the plaintiff has presented an affidavit from McManus, the representative of the tourist agency at the Consolidated Air Service counter, that the sign was on one wall of a waiting room near the counter and not at the counter. Plaintiff claims that the sign was on a wall of a public waiting room at an extreme end of the Newark Air Terminal, at an *exit* where persons *leaving* the airport obtain taxis. Plaintiff further claims that to get to the Consolidated counter, the decedent had

to enter through the main entrance of the airport hundreds of feet away from the waiting room. There is, of course, no proof that decedent ever saw the sign.

Little, if anything, turns on the sign or what it said or where it was, for applicants for insurance are not affected with notice by reason of wall signs nor do they incorporate words or definitions from wall signs into their insurance contracts. It does serve the purpose of showing that the parties here are in disagreement on nearly everything except a few undisputed facts.

What contract of insurance, then, did the decedent purchase? She intended to buy coverage for her flight to Miami. The defendant says it did not intend to cover her on that flight. We all know that a contract of insurance, drawn by the insurer, must be read through the eyes of the average man on the street or the average housewife who purchases it. Neither of them is expected to carry the Civil Aeronautics Act or the Code of Federal Regulations when taking a plane. We have never departed from our statement in *Kenyon* v. *Knights Templar & Masonic Mut. Aid Assn.* (122 N. Y. 247, 254): "It may preliminarily be observed that, as a general rule, the construction of a written instrument is a question of law for the court to determine, but when the language employed is not free from ambiguity, or when it is equivocal and its interpretation depends upon the sense in which the words were used, in view of the subject to which they relate, the relation of the parties and the surrounding circumstances properly applicable to it, the intent of the parties becomes a matter of inquiry, and the interpretation of the language used by them is a mixed question of law and fact." (See, also, *Hartol Products Corp.* v. *Prudential Ins. Co.*, 290 N. Y. 44, 49; *Rappaport* v. *Phil Gottlieb-Sattler, Inc.*, 280 App. Div. 424, affd. 305 N. Y. 594.) Was the decedent entitled to believe that she had purchased "AIRLINE TRIP INSURANCE" through a policy "LIMITED TO AIRCRAFT ACCIDENTS"? It seems to us that a jury could find that when decedent purchased her policy on an application for "AIRLINE TRIP INSURANCE" from a machine having in prominent lighting those same three words, before obtaining her ticket *from a counter in front of which the machine stood,* she was covered on her flight, since the minds of the decedent and the company had met on that

basis. In other words, since defendant put one of its automatic vending machines in front of the ticket counter of the Consolidated Air Service which, according to an affidavit submitted by defendant, " was utilized by all non-scheduled airlines operating out of the Newark Airport, as a processing point for their passengers, and before any passenger on a non-scheduled airline could receive his ticket he was required to present his ' exchange order ' at said counter" we think a jury might find that the defendant was inviting those passengers to insure themselves by its " AIRLINE TRIP INSURANCE ".

Decedent was invited to purchase " AIRLINE TRIP INSUR-ANCE "; she applied for " AIRLINE TRIP INSURANCE "; on the envelope to carry the policy to her daughter beneficiary was " AIRLINE TRIP INSURANCE " but defendant says that was not what decedent purchased. Shall the defendant, which wrote the policy, be permitted to say that " AIRLINE TRIP INSURANCE " " means just what I choose it to mean " and therefore means that a flight on a " non-scheduled " airline is not covered by the policy? Defendant concedes that the " action is brought by the plaintiff to recover upon defendant's Airline Trip Insurance policy " but " defendant contends that the policy did not cover the alleged loss of life of the said Sadie Bernstein because she lost her life in the crash of an aircraft which was not a flight operated *by* a Civilian *Scheduled* Airline." (Emphasis by defendant.) That draws the line of construction very finely. Plaintiff claims that Miami Airline, Inc., maintained regular, published schedules of fares and schedules showing passenger mile rates and that it held itself out as maintaining regular schedules of flights and tickets were sold for stated hours of departure and that it was licensed by the Civil Aeronautics Board to carry passengers and freight with large aircraft in interstate, overseas and foreign air transportation. We think there is a question of fact presented. As we pointed out in *Hartol Products Corp.* v. *Prudential Ins. Co.* (*supra*), the burden in such a case as this is on the defendant to establish that the words and expressions used not only are susceptible of the construction sought by defendant but that it is the only construction which may fairly be placed on them. The defendant in its large illuminated lettering and in its application could have added

proper, unambiguous words or a definition or could have avoided allowing its vending machine to be placed in front of the ticket counter " utilized by all non-scheduled airlines operating out of the Newark Airport ", thus removing the ambiguity or equivocal character of the invitation to insure, of the application for insurance and the contract of insurance itself. Perhaps we should point out here that even that might not have helped, for if decedent had engaged a lawyer to examine the Civil Aeronautics Act of 1938 as amended and the Code of Federal Regulations before purchasing her policy, she would have learned, and the defendant concedes, that the term " Civilian Scheduled Airline " cannot be found in them and there is no such terminology used. There is also no reference to nor mention of the words " Scheduled Airline " in the Code of Federal Regulations. There is no definition of " Scheduled Airline " or of " Non-scheduled Airline " in the Civil Aeronautics Act of 1938 as amended.

No doubt it is advisable, if not indeed necessary, as a matter of business competition to sell insurance policies from automatic vending machines. It may save money to have a number of machines instead of a salesman. It may be wise because people hurrying to planes will not wait on a line to buy insurance. However, there must be a meeting of minds achieved between the applicant and the company through an application and signs and lettering, for while the applicant has a mind the machine has none and cannot answer questions. If the defendant had paid for a living salesman, the decedent would not have purchased the insurance if it did not cover her trip or she might have purchased it and changed her plane. So there must be additional care taken. While all this makes it more difficult for the insurance company, there is another side to the question. If the rule here was not made strict when machines are utilized it would mean that in this large terminal *all* persons who put money into the machines there and then, thinking they were insured, went off on one of the ten so-called " non-scheduled air carriers," would have no insurance for their beneficiaries and the company would be in receipt of contributions for which no service was ever rendered.

As we pointed out earlier, neither Special Term nor the Appellate Division made any finding. It is urged upon us that the term " scheduled airline " has gained such wide and general currency that it has become part of the speech of the average man even though it is not defined in any statute. That may or may not be so as to air-travelers but we do not know whether the decedent had ever been on a plane before. At any rate this court has no power to make findings here. Even the definition suggested by defendant in its brief seems to require more knowledge than the average layman has. According to defendant a " Civilian Scheduled Airline " is an " air carrier which obtains a certificate of public convenience and necessity as provided in Section 401 of the Civil Aeronautics Act ". It should be noted that the defense is not that a particular flight is not scheduled but that the airline is not a civilian scheduled one. The attempt of defendant to establish that the term " Civilian Scheduled Airline " has a clear and definite meaning has caused it to bring forward and present an enormous amount of proof extrinsic to the policy including a statute, regulations, newspaper and magazine articles, etc. By this mountain of work it seems to us that defendant has established that " Civilian Scheduled Airline " is not at all free from ambiguity and vagueness — if it were not so the contract of insurance itself would disclose within its four corners the intent of the parties in entering into it.

The order of the Appellate Division should be affirmed, with costs, the first question certified answered in the affirmative and the second question certified answered in the negative.

FULD, J. (dissenting). In Alice's Wonderland, a word, said Humpty Dumpty, " means just what I choose it to mean ". But, in a jurisdiction more mundane, I do not perceive how we may say that the word " scheduled " can mean " non-scheduled," nor do I see how we may tell a jury that it can·say that an insurance policy which in express terms applies " only " to " scheduled airlines " can cover flights by an airline listed and self-described as " non-scheduled ".

Mrs. Sadie Bernstein had made arrangements through a travel agency in New York City to fly to Miami, Florida. At about 8:00 A.M. of December 16, 1951, just before picking up a trans-

portation ticket of Miami Airline, Inc., she procured from a vending machine at the airport an insurance policy for $25,000. The plane took off some seven hours later, at three o'clock in the afternoon, and crashed a few minutes thereafter.

The policy, on its first page, in clear and legible type, states in so many words that it is limited to flights by " Scheduled Airlines "; the provision reads, in part, as follows:

" This insurance shall apply *only* to such injuries sustained following the purchase by or for the Insured of a transportation ticket from * * * *a Scheduled Airline* during any portion of the first one way or round airline trip covered by such transportation ticket * * * between the Point of Departure and the Destination shown above, in consequence of : (a) boarding, riding as a passenger in, alighting from * * * any aircraft operated on a regular or special or chartered flight by a *Civilian Scheduled Airline* maintaining regular, published schedules and licensed for interstate, intrastate or international transportation of passengers by the Governmental Authority having jurisdiction over Civil Aviation ". (Emphasis supplied.)

And, at the bottom of that same page, in larger letters, appears the further legend,

" THIS LIMITED POLICY PROVIDES PAYMENT FOR LOSS OF LIFE, LIMB OR SIGHT AND OTHER SPECIFIED LOSSES BY ACCIDENTAL BODILY INJURY WHILE A PASSENGER ON CIVILIAN SCHEDULED AIRLINES ".

A specimen policy, identical with that issued, was attached to the vending machine for inspection by any person desiring to obtain one of the policies. And, in addition, a large placard on the face of the machine — following the caption " ' Domestic ' Airline Trip Insurance " — also gave notice that the insurance " COVERS * * * FLIGHT * * * ON ANY SCHEDULED AIRLINE."

While it might have been sufficient to show that there are two separate and distinct classes of airlines, the " scheduled " and the " nonscheduled ", the insurer went far beyond that in this case. Recognizing, perhaps, the inconspicuousness of the obvious, defendant has marshalled a veritable mountain of material — contained in statute and regulations, in opinions and

reports, in newspapers and magazines — to demonstrate that the term "scheduled airline" has gained a wide and general currency, and that it is a term of clear and precise meaning, which has become part and parcel of the ordinary person's everyday vocabulary. Defined by any standard and from any point of view, and compressed into a sentence, it simply and solely denotes a common carrier permitted to operate, or to hold out to the public that it operates, one or more airplanes between designated points regularly, or with a reasonable degree of regularity, in accordance with a previously announced schedule.

Its origin is in the Civil Aeronautics Act and the pertinent regulations issued by the Civil Aeronautics Board. By subdivision (a) of section 401 of the Act, no citizen is authorized to engage in interstate, overseas or foreign air transportation, unless he first obtains a certificate of public convenience and necessity from the Board. (See 52 U. S. Stat. 987, U. S. Code, tit. 49, § 481, subd. [a].) The Board, however, is empowered to exempt from the requirement of certification any class of air carrier, including those "*not engaged in scheduled air transportation*" (52 U. S. Stat. 1005, U. S. Code, tit. 49, § 496, subd. [b]). And, pursuant to the authority thus granted, the Board in 1938 provided that "every air carrier which engages solely in *non-scheduled operations* shall be exempt" from the statute's certification provisions (Code of Fed. Reg. [Cum. Supp., 1944], tit. 14, § 292.1; see, also, Code of Fed. Reg. [1952 Rev. ed.], tit. 14, § 291.1).[1]

The controversies involving the nonscheduled airlines, the endeavor to provide greater safety to the public traveling those lines, are reflected in. the Board's reports. Those matters do not, as such, concern us, and we refer to them only for the purpose of demonstrating that the distinction, between "an air

1. Although this regulation (§ 292.1) defined, in terms, only nonscheduled operations, by implication it necessarily defined scheduled operations as well. And the Board later made the implication express in one of its decisions — *Large Irregular Carriers, Exemptions,* 11 C.A.B. 609, 612 — wherein it said that under section 292.1 a carrier was scheduled, if it "held out to the public by advertisement or otherwise that it would operate one or more airplanes between such [designated] · points regularly or with a reasonable degree of regularity."

carrier engaged in scheduled air transportation '' and a carrier not so engaged, has been consistently maintained. In the investigations carried on over the years, the meaning of the term, '' scheduled airline '' or '' scheduled air carrier,'' was crucial and vital.[2] In its *Investigation of Nonscheduled Air Services* (6 C. A. B. 1049, 1054–1055) for instance, the Board declared: '' The scheduled air carrier operates pursuant to a scheme or plan under which, within the physical limitations of equipment and facilities, a definite quantum of service is constantly available to the traveling public, and is held out as such through course of conduct in maintaining reasonably regular service, filing of schedules and tariffs, advertisements, etc. * * * It therefore becomes apparent that ' nonscheduled ' has a far more restrictive meaning than the mere absence of a published time-table.'' And similar definitions are contained in an almost endless number of other opinions by the Board. (See, e.g., *Large Irregular Carriers, Exemptions, supra,* 11 C.A.B. 609, 612; *Standard Airlines, Inc., et al., Exemption Request,* 9 C.A.B. 583, 586; *Page Airways, Inc., Investigations,* 6 C.A.B. 1061; *Trans-Marine Airlines, Inc., Investigation of Activities,* 6 C.A.B. 1071; *Matter of Noncertificated Operations of Trans-Caribbean Air Cargo Lines, Inc.,* Order Serial No. E-370, adopted March 14, 1947.)

The courts, as well as Congress and the Civil Aeronautics Board, have invariably recognized that the '' scheduled airline '' is a definite, well-understood class of carrier. (See *United States* v. *Eagle Star Ins. Co.,* 196 F. 2d 317, 318; *S. S. W., Inc.,* v. *Air Transport Assn. of America,* 191 F. 2d 658, 660; *Civil Aeronautics Bd.* v. *Modern Air Transport,* 179 F. 2d 622; *Putnam* v. *Air Transport Assn. of America,* 112 F. Supp. 885, 886; *Apgar Travel Agency* v. *International Air Trans. Assn.,* 107 F. Supp. 706; *Pacific Northern Airlines* v. *Alaska Airlines,* 80 F. Supp. 592.) The language in the *Apgar* case (*supra,* 107 F. Supp. 706, 708) is illustrative and illuminating: '' Plaintiff is

2. Indeed, the Board has used the "scheduled" air operation as the starting point for almost the whole of its comprehensive system of economic and safety regulations. (See, e.g., Code of Fed. Reg. [1952 Rev. ed.], tit. 14, pt. 40, § 40.1, which, in its introduction, specifies that "the following regulations are prescribed for such certification of *scheduled* air carriers" and, *ibid.,* pt. 61, entitled "Scheduled Air Carrier Rules.")

an independent ticket agency serving, among others, *non-scheduled* (or irregular) air carriers. *Defendants are four scheduled air carriers,* two trade associations of companies engaged in scheduled air transportation ". (Emphasis supplied.)

As a response to all this, plaintiff contends that, whatever meaning the term may have under the statute or under the regulations, that meaning, in the absence of an express incorporation of such material, does not bind one not chargeable with knowledge of administrative action. The point might be well taken, if to the so-called " average " man — upon whose knowledge plaintiff relies — the term had a meaning which was unclear or different from that announced by the regulatory agency or the courts. Words may, of course, have different significations to different people, at different times or under different circumstances, but that is not the case insofar as the term " scheduled airline " is concerned. The meaning given it by law has, as it were, passed into the public domain, where, in line with the current zest for abbreviation, it is usually referred to as a " sked," to differentiate it from its counterpart, the "nonsked."

In point of fact, we might well have taken judicial notice of the term and its meaning, had the record not been as replete as it is with illustrations from the daily press and from popular magazines and books with large nationwide circulations.[3] For instance, the president of a firm leasing planes to a non-scheduled carrier wrote in *Fortune* Magazine for August, 1949: " It is now only a year ago that my air-freight line, California Eastern Airways, Inc., leased one of its DC-4 ships to a ' large irregular ' or non-scheduled carrier, popularly known as a non-sked. * * * *Non-scheduled airlines* use the same well-proved planes used by all airlines. But Douglas DC-3's of the *scheduled airlines* carry twenty-one seats; those of the non-skeds, twenty-eight. Most of the DC-4's of the scheduled lines contain forty-four seats; we now have sixty-seven in ours " (pp. 51–52). A feature article in the March, 1951, issue of *Cosmopolitan* Magazine captioned, " Don't Fly the Unscheduled

3. See, e.g., *New York Times,* July 8, 1951, p. 1, July 14, 1951, p. 12; *New York Daily News,* Jan. 4, 1949, p. 3; *Coronet* Magazine, May, 1951, p. 28; *Cosmopolitan* Magazine, March, 1951, p. 66; *Fortune* Magazine, Aug., 1949, p. 51; *Harper's* Magazine, May, 1949, p. 64; *Time* Magazine, May 2, 1949, p. 86; see, also, 1 Collier's Encyclopedia (1949), pp. 266–272, 279.

Air Lines!'', takes for granted the classification of, and the distinction between, scheduled and nonscheduled carriers (p. 66). And in *Harper's* Magazine for May, 1949, we find this discussion of scheduled airlines and nonscheduled flights (p. 67): '' Including taxes, you would pay $113 for a *nonscheduled flight* from New York to Los Angeles, as against $181 on a *scheduled airline*. These carriers are non-scheduled in the sense that they are not permitted by the Civil Aeronautics Board to fly more than a limited number of trips between any two cities each month, and because they cannot, therefore, represent themselves to the public as running on regular time-tables.''

It is thus made evident that the general public encountered the term '' scheduled airline '' in the course of its normal and ordinary reading of newspapers and magazines, and the context in which the term appeared demonstrates that to the average person it had the same clear and definite meaning as it had for the federal agency which originally used it.

That being so, it follows, almost as a matter of course, that the fatal flight upon which plaintiff's insured had embarked was not covered by the policy. The Letter of Registration, which Miami Airline had received from the Civil Aeronautics Board, classified and described it as a '' Non-certificated Irregular Air Carrier '' — the equivalent of a Nonscheduled Airline (see, e.g., *S. S. W., Inc.* v. *Air Transport Assn. of America, supra,* 191 F. 2d 658, 660; *Apgar Travel Agency* v. *International Air Trans. Assn., supra,* 107 F. Supp. 706, 708; *Large Irregular Carriers, Exemptions, supra,* 11 C. A. B. 609; see, also, *Time* Magazine, May 2, 1949, *op. cit.,* p. 86) — and its status as such finds indisputable confirmation in Miami's Tariff, which specifies, on its title page, that it '' contains local rates and rules * * * Applicable For *Non-Scheduled* [passenger and freight] Service ''. (Tariff No. 5, C. A. B. No. 5.)[4]

Nor was Miami's classification as a nonscheduled carrier kept a secret. Hanging on the wall at the right hand end of the counter where the insured had picked up her ticket was a fairly large sign — measuring some three feet by four feet — bearing

---

4. It is further revealing that, in one of the rules (No. 6) set forth in its Tariff, Miami declared that no stopover privileges shall be granted "because of *nonscheduled* character of our permit." (Italics supplied.)

the caption in large capital letters:

" NON SCHEDULED AIR CARRIERS
AUTHORIZED TO CONDUCT BUSINESS
IN THIS TERMINAL ".

" MIAMI AIRLINE " — also in capital letters — was one of ten such carriers listed.

An insurance company is as free as any other party to limit and condition its liability as it sees fit, so long as there is no statutory provision or rule of public policy to the contrary. " A plain contract, clear and explicit in its terms," we wrote in *Weinberg & Holman, Inc.*, v. *Providence Washington Ins. Co.* (254 N. Y. 387, 390–391), " is to be construed by the court. Equitable considerations will not allow an extension of the coverage beyond its fair intent and meaning in order to do raw equity and to obviate objections which might have been foreseen and guarded against, even though the contract to be construed is a policy of insurance." A company, issuing a policy covering only flights on a " scheduled airline ", has not agreed to insure every sort of flight, and, if injury or death does occur in the course of a flight by a nonscheduled or irregular carrier, liability may not be foisted upon the insurer.[5] Certainly, the policy's coverage may not be changed or expanded on the theory, suggested by the court (opinion, p. 366), that, had Mrs. Bernstein dealt with a salesman instead of a machine, she " would not have purchased the insurance if it did not cover her trip ". Nor may it be changed or expanded simply because the machine's placard bore the legend " Airline Trip Insurance ", before noting that such insurance was limited to flights on scheduled airlines. And, just as obviously, a policy is not rendered unclear or ambiguous because the insured may not have understood the language used or its significance. The test for ambiguity is not subjective — which is but another way of stating that the issue is, not whether the insured knew, but

---

5. Not only was the specified limitation of coverage within defendant's power, but it was a wholly reasonable one. Whether or not the nonskeds had a poorer safety record than the scheduled carriers, the fact is that they remained a greater risk from an insurance point of view. Since the nonskeds generally carried a larger number of passengers in each plane, a crash would probably impose a greater monetary loss upon the insurer.

whether she had reason to know, the content and purport of the contract she signed. (See, e.g., *Tonkin* v. *California Ins. Co.*, 294 N. Y. 326; *Hartol Products Corp.* v. *Prudential Ins. Co.*, 290 N. Y. 44; *Silverstein* v. *Metropolitan Life Ins. Co.*, 254 N. Y. 81; *Metzger* v. *Aetna Ins. Co.*, 227 N. Y. 411; see, also Restatement, Contracts, § 230.)

However, even if we were to assume, contrary to the fact, that the policy was ambiguous, the mere existence of an ambiguity would not suffice to establish plaintiff's cause of action or justify denial of defendant's motion for summary judgment. Even if, in other words, the policy term were susceptible of several interpretations, that could not assist the insured, or his beneficiary, unless it appeared that one of those interpretations would reasonably " ' sustain his claim  *  *  * and cover the loss ' ". (*Houlihan* v. *Preferred Accident Ins. Co.*, 196 N. Y. 337, 340; see, also, *Witherstine* v. *Employees' Liability Assur. Corp.*, 235 N. Y. 168, 171 *et seq.*) Despite plaintiff's repeated insistence that " scheduled airline " is a term of ambiguous import, it is significant that she does not even suggest what meaning could reasonably be given it other than the one here accorded. And the only item upon which she relies to come within that meaning is a list of Miami's flights during the year 1951. This list, plaintiff asserts, is a " schedule " and, hence, the argument runs, Miami is a " scheduled " airline. Entirely overlooked is the circumstance that the list was prepared after the year had passed. Quite obviously, therefore, it constituted a record of past flights and not a schedule of current or future departures. In any event, the contention that such a list was evidence that Miami operated as a scheduled carrier ignores entirely the Board's Letter of Registration, expressly classifying it as an " Irregular Carrier " and the Board's Tariff, explicitly describing its service as " Non-Scheduled ".

Differences of fact concerning items not material to the decision to be made may not, of course, be relied upon to defeat a motion for summary judgment. The present action is one solely to enforce the policy as written, and, accordingly, there is no need for a trial to resolve the dispute whether the large public sign listing Miami as a " non scheduled " carrier was

seen by the insured; whether the placard on defendant's vending machine made it clear that the policy was limited to " scheduled airlines " alone; or whether the machine was so close to the counter where the insured obtained her ticket as to create the impression that a policy covered a Miami Airline flight.

I would reverse the order appealed from and grant defendant's motion for summary judgment.

LEWIS, Ch. J., DYE and FROESSEL, JJ., concur with CONWAY, J.; FULD, J., dissents in opinion in which DESMOND, J., concurs; VAN VOORHIS, J., taking no part.

Order affirmed, etc.