Michael Catalano, J.
The plaintiffs’ affirmative ease was tried before the court without a jury, pursuant to an order of this court dated May 15, 1961.
The amended complaint contained five alleged causes of action: the first was based on duress exercised by defendants upon plaintiffs, forcing the latter to sign a deed represented as a mortgage on plaintiffs’ premises located on Broadway and Shepard Street, Buffalo, New York; the second alleged that plaintiffs executed said deed for insufficient consideration; the third was for fraud practiced by defendants upon plaintiffs in violation of a trust relationship; the fourth was for rent of $550 for use of said premises and for profits of $20,000 received in a gasoline station business; the fifth was for conversion of merchandise and equipment valued at $9,000. The relief sought was rescission of the deed, accounting, receiver, injunction and $29,000.
At the beginning of the trial, parties stipulated to strike the first, second and fourth causes of action and drop Frank R. Rameaka as a defendant; at the end, they agreed to dismiss the fifth, leaving only the third for this court’s decision.
The question is: Did defendant corporation fraudulently induce plaintiffs to sign a deed to said premises, by representing the instrument to be a mortgage?
In 1946 plaintiffs, husband and wife, purchased a parcel of land, 50 feet front and rear, 130 feet deep, located at 1588 Broadway, corner of Shepard Street, in the City of Buffalo, New York. Thereafter they built a tire store and gasoline station thereon, conducting the business together until January, 1960.
In February or March, 1959 plaintiffs met Frank R. Rameaka, president of defendant corporation, who desired to have General tires sold at the Broadway location.
In March, 1959 Rameaka delivered a proposed agreement to plaintiffs, suggesting they consult their lawyer about it. Helen (plaintiff wife) took it to a lawyer who approved of it. Then she went to Edward (her husband), explained what the lawyer had said, then both Helen and Edward signed it before Rameaka,. who never signed it.
The alleged agreement, dated March 30, 1959, provided that defendant will purchase plaintiffs’ equipment and inventory, maintain tires and tubes on the premises, as well as certain equipment, receive interest on its investment for inventory, equipment and leasehold improvements, receive a lease to the premises for five years with option to renew, assist plaintiffs *386 in managing the store, share tire store profits equally with plaintiffs.
On April 7, 1959 plaintiffs signed and delivered a bill of sale of their equipment and merchandise to defendant for $1,500.
Thereafter Helen asked Rameaka to assist her in obtaining a loan by increasing the mortgage upon plaintiffs’ residence at 77 Pontiac Street, so as to remodel the house from a two-family into a single-family dwelling. Rameaka suggested that Helen increase the two mortgages, the first for $11,000 and the second for $1,200, then covering the 1588 Broadway premises. Helen requested Rameaka to obtain a further bank mortgage on Broadway; he tried but failed. She asked him to obtain a loan from General Tire Company of Akron, Ohio, of which defendant corporation is a wholly-owned subsidiary; he tried but failed. She asked him to loan plaintiffs money from his personal funds; he refused.
On May 26, 1959 plaintiffs signed and delivered a demand promissory note for $3,000 payable to defendant, receiving $3,000 therefor.
On June 1, 1959 Edward signed an agreement granting defendant an option to purchase a retail tire business to be known as Eddie’s General Tire, Inc. On June 20,1959 defendant acknowledged receipt of this option.
On June 5, 1959 plaintiffs signed and delivered a demand promissory note for $6,000 payable to defendant, receiving $3,000. This note was intended to include the prior $3,000 payment. On said date, defendant executed a standard purchase offer (approved in form by Buffalo Real Estate Board, Inc.), offering to purchase 1588 Broadway from plaintiffs for $20,000; plaintiffs signed it once acknowledging receipt of a deposit of $3,000 from the purchaser, then they signed it the second time under a paragraph entitled Acceptance, stating: “ The undersigned, herein called the seller, hereby accepts the above offer and agrees to sell and convey said premises at the price and upon the terms set forth; and acknowledges receipt of the deposit on account and also acknowledges receipt of a copy of this agreement.” Helen read this paragraph in open court, understood it clearly and did not deny its contents.
On June 10, 1959 defendant and Edward signed a so-called “ buy-out” agreement, giving Edward an option to purchase all of the stock of Eddie’s General Tire, Inc., a New York corporation, wholly owned by defendant. On said date Edward and Eddie’s General Tire, Inc., signed an employment contract, whereby Edward was appointed general manager of the corporation’s business at a salary of $500 monthly.
*387 No lease was ever executed by plaintiffs.
The tire and gasoline business was operated by plaintiffs for over 13 years. Helen kept the books, sold tires and gasoline. Edward sold tires and gasoline, made out sales slips, could read “ common words ”, was “ very good ” in arithmetic, but could not read; he had gone to a special class for the physically handicapped. He has a speech impediment which forced Mm to attend a class known as “ 4-F ” which he left when he was 16 years old. He always relied on Ms wife to read for him and advise him as to what papers to sign or not sign. Plaintiffs did not rely on defendant or Rameaka as to the sigrnng of papers without first reading or glancing at them to satisfy themselves that they were what they wanted to sign. When plaintiffs believed it necessary to understand legal papers they retained a lawyer of their choice for that purpose.
Plaintiffs were in financial difficulty in 1959 and needed money to pay current and overdue taxes, fire insurance premiums, mortgage installment payments and sewer rents.
Before June 30, 1959 plaintiffs had purchased two parcels of real property, having received two deeds, and had executed five mortgages as liens upon those parcels. Plaintiffs understood the differences between a deed and a mortgage.
On June 30, 1959 plaintiffs, Rameaka, Dan Mancinelli (defendant’s accountant) and Emmett McGarvey met at the law offices of the firm of Hetzelt and Watson, of wMch McGarvey was a member. This law firm were attorneys for defendant, not for plaintiffs. McGarvey had prepared all the papers for what plaintiffs contend was a mortgage transaction and defendant contends was a deed closing. McGarvey sat at the desk, plaintiffs sat close to the desk on the left-hand side, Rameaka and Mancinelli sat on the right some distance from the desk. McGarvey reviewed and explained the statement of closing to plaintiffs, starting with the credit to purchaser of $6,000 which plaintiffs admitted they had received. McGarvey explained to plaintiffs a check for $11,213.62 payable to Liberty Bank of Buffalo, drawn by defendant to pay the balance of the first mortgage on said Broadway premises; also, a check for $1,196.33 payable to the Treasurer, City of Buffalo, drawn by defendant to pay for and redeem the 1957 and 1958 city taxes which had been sold to third persons and to pay the delinquent 1958 to 1959 sewer rent, concerning said premises; also, a check for $249.62 payable to Erie County Treasurer, drawn by defendant to pay for the delinquent 1959 county tax, concerning said premises; also, a check for $1,200 payable to Constance Koscielny, drawn-by defendant to pay for the release of a *388 second mortgage on said premises; and also, a check for $339.96 payable to plaintiffs, and delivered to plaintiffs, constituting the balance due them on the sale of said premises to defendant.
McGrarvey gave one copy of the closing statement to plaintiffs, another to Rameaka and retained one for himself. Plaintiffs had their copy in front of them on the desk during McGrarvey’s explanation. McGrarvey said the “ sale price ” was $20,000; plaintiffs said nothing at that time and asked no questions.
McGrarvey explained the credit to plaintiffs of $82.89 for the unexpired term of the fire insurance of $17,000 on said premises, but later found the premium of $221 had not been paid by plaintiffs who repaid this credit amount to defendant.
No one mentioned a mortgage or a loan on June 30, 1959, except for the first Liberty Bank mortgage and the second Koscielny mortgage which were paid by defendant as aforesaid.
Finally McGrarvey explained the deed to plaintiffs. He said it was a standard form warranty deed, running from them, reading plaintiffs’ names, to defendant, reciting one and more dollars which was the customary way of setting up the consideration paid in a deed. He did not read the entire deed to plaintiffs. He said the description contained in the deed was the description of plaintiffs’ property at the corner of Broadway and Shepard Streets, and this was a deed covering the premises. He turned the deed over and said plaintiffs should sign it if they wanted to sign the deed at the place where they had their names typed. Plaintiffs looked at the deed, then they signed it and McGrarvey notarized it. Plaintiffs looked at the deed, which was placed before them to be read, during McGarvey’s summarization of the deed.
In 1959 the assessed valuation of these premises by the County of Erie for tax purposes was $16,840. The reasonable market value of these premises on June 30, 1959 was $22,887.
At no time did Rameaka represent or state to plaintiffs that the said deed dated June 30, 1959 was a mortgage.
On July 10, 1959 Rameaka requested Helen to pay the rent for plaintiffs’ use of the gasoline station business at said premises which plaintiffs were operating.
Defendant did not defraud plaintiffs.
Plaintiffs never demanded that defendant return said property to them. Plaintiffs never tendered to defendant the amount of money received from defendant.
Rameaka, president of defendant in 1959 and at time of trial, desired to grant plaintiffs a franchise for the Broadway *389 premises to distribute and sell General tires. In March, 1959 said premises were in a dirty condition, required cleaning, repair and remodeling in order to merchandise and sell tires properly. So, Bameaka had defendant paint these premises inside and out, install inlaid linoleum throughout the storeroom, excavate and build in a front-end alignment pit in order to install a front-end alignment machine, install said machine, add an additional bay to the building 20 feet wide and 27 feet long, install a new roof and lift the roof of the building, repair overhead doors, replace the front door, build a closing room, build seven tire racks into the building for merchandising tires, install new plumbing and underground piping and install a burglar alarm system; all costing defendant $5,000.
In May, 1959 plaintiffs and Bameaka first discussed the sale of said premises to defendant for $20,000. The negotiations continued to June 30, 1959 when the sale actually took place.
Bameaka started with the General Tire Company 10 years ago as a salesman; for the last 6, he has been president of defendant. Before working for General, Bameaka was a special agent in the Federal Bureau of Investigation. He is now 39 years of age. In 1947 he obtained a degree of bachelor of social science, after four years of study at Holy Cross College at Worcester, Massachusetts. His college training included sales training with Firestone Tire and Bubber Company.
Fraud is the intentional deprivation of another’s legal rights, designedly and knowingly committed. (Reno v. Bull, 226 N. Y. 546, 552.) A contract, induced by fraudulent representations, gives rise to three remedies. (1) The victim may rescind the contract before suit, then sue for damages in an action at law, after restoring or offering to restore what he had received. (2) He may sue for rescission in an action in equity, asking for full relief, offering to return what he had received in the complaint, then actually tendering it on the trial. (3) He may retain what he had received, then bring an action at law to recover damages. (See Fitzgerald v. Title Guar. & Trust Co., 290 N. Y. 376, 379; McGowan v. Blake, 134 App. Div. 165; Gould v. Cayuga County Nat. Bank, 86 N. Y. 75, 83.)
Here, plaintiffs have pursued the second choice, seeking rescission by the court, but they have failed to return the purchase price, namely $20,000 to defendant, of to allege it in the complaint, or to tender it at the trial.
Generally, one who actually signs a deed before a notarizing officer is conclusively bound, although he mentally fails to assent to the expressed terms, for if he can read, not to read is gross negligence, and if he cannot read, not to have it read is equally *390 negligent. (Pimpinello v. Swift & Co., 253 N. Y. 159, 162-163. Accord: Amend v. Hurley, 293 N. Y. 587, 595; Matter of Stone, 272 N. Y. 121, 124; White v. Idsardi, 253 App. Div. 96, 100 [4th Dept.].)
Here, plaintiffs failed to read the deed they signed before a commissioner of deeds and failed to have it read. A lawyer for defendant explained its contents fully to them, referring to it as a deed many times. No one ever called the deed a mortgage at any time.
Ignorance through negligence or inexcusable trustfulness is no ground for relief from contractual obligations. (Metzger v. Ætna Ins. Co., 227 N. Y. 411, 416.) The test for ambiguity of a written contract is never subjective; in others words, the test is not whether the person signing the contract knew, but whether he had reason to know, the contents and meaning of that contract. (Lachs v. Fidelity & Cas. Co., 306 N. Y. 357, 373-374.)
In this case, plaintiffs claim ignorance of the contents of the deed, not knowing it was not a mortgage, but believing it was a mortgage. They did not read the deed nor ask anyone whether it was a mortgage or a deed, having reasonable opportunity to do both. They had reason to know the contents and meaning of the deed.
Plaintiffs insist that the deed they signed should be can-celled on the ground that the price was so inadequate as to be unconscionable. Their real estate broker testified that he appraised 1588 Broadway (premises involved) on September 1, 1961, or two years and two months after the sale in question. He told the court he could not state the value thereof as of June 30, 1959. Then he testified: “Assuming there has been no change in the building since * * * 1959 ’ the value would be the same as on September 1, 1961, or $46,000. This is based upon an erroneous premise and is rejected accordingly.
Plaintiffs’ authorities have been examined and found not applicable to this case. In Turner v. Pabst Brewing Co. (74 App. Div. 106) there was actual fraud; here there is none; in Rothschild v. Roux (78 App. Div. 282) a statute prohibited a sale of annuities, so the advances were held to be loans not sales, here we have a sale; in Matter of Smith (95 N. Y. 516) the proponent and chief beneficiary of the will was a lawyer who drew the will of a client 75 years old found to be non compos, here Rameaka is not a lawyer and plaintiffs have excellent minds; in Cowee v. Cornell (75 N. Y. 91) a man over 90 yéars old, partially blind, gave his trusted grandson a note for $20,000 which was upheld, here plaintiffs have no infirmities of age or blindness; in Green v. Roworth (113 N. Y. 462) two *391 sons obtained through fraud and undue influence two deeds from their 76-year-old father who had failing memory and was physically incapacitated, here plaintiffs have excellent memories and no fraud exists; in Johnson v. Woodworth (134 App. Div. 715) a 70-year-old widow, physically infirm and weak, sold to a stranger her farm worth $2,000 for less than $500, here a property worth under $23,000 was sold for $20,000 by an employee and his wife to his employer which had entered into a “buy-out” contract with the employee.
The other authorities cited by plaintiffs do not change the conclusion now made, namely, that the question herein is answered: No. Therefore, judgment is granted to defendant against plaintiffs, with costs.