Josephine MESSINA, Plaintiff,

v.

MUTUAL BENEFIT HEALTH AND AC-
CIDENT ASSOCIATION, Defendant.

Civ. A. No. 3776-60.

United States District Court
District of Columbia.

April 24, 1964.

Austin P. Frum, Thomas S. Jackson, Jackson, Gray & Laskey, Washington, D. C., for plaintiff.

John J. Leahy, Kelly, Keating & Leahy, Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

This is a suit by the beneficiary of a life insurance policy against the defendant insurance company for the proceeds of a $50,000 policy purchased by plaintiff's husband while en route from Korea to his home in Maryland. The issue is whether the flight which crashed, killing plaintiff's husband, was within the risks covered by the policy.

Salvatore Messina, a civilian employee of the Department of the Army, Corps of Engineers, was employed as a construction representative in Seoul, Korea, in January, 1960. Due to a reduction in force, Mr. Messina was ordered back to his home in Brentwood, Maryland. His travel from Seoul, Korea, to Maryland was pursuant to Government travel orders. Mr. Messina travelled from Korea to Tachikawa Air Force Base, Japan, and there he purchased from the defendant herein a policy of insurance in the face amount of $50,000, naming his wife as beneficiary. He mailed the policy to his wife at his home address. Mr. Messina flew from Tachikawa Air Force Base to Travis Air Force Base, California, on a commercial air carrier on a flight contracted for by the Military Air Transport Service (MATS). Upon his arrival at Travis, on January 25, 1960, Mr. Messina purchased, with a Government transportation request, a ticket on a United Airlines flight from San Francisco International Airport to Washington, D. C. Mr. Messina also purchased, with $15 of his own money, a ticket on a flight operated by Travis Transportation Company, Inc., from Travis to San Francisco International Airport; Travis and San Francisco Airport are about sixty-seven miles apart, and the flight was by "air-taxi"—a non-scheduled service operating between the two airports. The plane on which Mr. Messina was riding crashed en route to San Francisco International Airport, and Mr. Messina suffered fatal injuries. The plaintiff, his widow, gave timely notice to the defendant and submitted the required proof of loss within the ninety-day period after Mr. Messina's death. On March 16, 1960, the defendant notified Mrs. Messina that it denied her claim on the ground that Mr. Messina was not covered under the terms of the policy. Thereafter the plaintiff filed her suit herein.

The sole issue is whether the fatal flight was covered by the insurance policy which Mr. Messina purchased.

On the first page of the four-page form contract, the following words appear at the top in bold-face:

"This Policy is Nonrenewable and Provides Benefits for Loss of Life, Limb or Sight and Other Specified Losses Resulting from Accidental Bodily Injuries Received *While a Passenger on Scheduled Airlines and Other Specified Conveyances* or While on the Premises of an Airport to the Extent Herein Provided." (Emphasis added.)

Then follows a "SCHEDULE," on which the purchaser fills in his name and address, the beneficiary's name and address, the point of departure, the destination, and the amount of the policy, the effective date, and the premium. On Mr. Messina's policy, the point of departure was listed as "TAW," which is the symbol for Tachikawa Air Force Base, Japan; the destination was listed as Washington, D. C.

The following language then appears in small but legible type beginning on the

first page and running over to the second:

"In consideration of the payment of the premium shown in the Schedule, the Association, subject to the provisions, limitations and exceptions of this policy, hereby insures the person named as Insured in the Schedule against loss of life, limb or sight and other specified losses resulting, independently of all other causes, from injuries. The term 'injuries', wherever used in this policy, shall mean accidental bodily *injuries received during any portion of the first one way or round trip which is made by the Insured, while this policy is in force, between the Point of Departure and the Destination designated in the Schedule* and for which the Insured has purchased a transportation ticket or has been issued a pass; *provided such injuries are received (1) while riding as a passenger in,* boarding or alighting from, or by being struck by *an aircraft operated on a regular, special or chartered flight* (a) by a scheduled airline of United States Registry holding a Certificate of Public Convenience and Necessity issued by the Civil Aeronautics Board of the United States of America or its successors, (b) by an intrastate scheduled airline of United States Registry maintaining regular published schedules and licenses for the transportation of passengers by a duly constituted authority having jurisdiction over civil aviation in the state in which said airline operates, (c) by a scheduled airline of foreign registry maintaining regular published schedules and licenses for transportation of passengers by the duly constituted governmental authority having jurisdiction over civil aviation in the country of registry of such airline, (d) *by, or contracted for by, the Military Air Transport Service (MATS) of the United States,* (e) by the Royal Canadian Air Force Air Transport Command or the Royal Air Force Air Transport Command of Great Britain, or (f) by the 315th or 322nd Air Divisions or the 5060th Transportation Squadron of the United States Air Force; or (2) while in or upon any premises or surface vehicle used for passengers and provided or arranged for by such airline or the authorities controlling an established airport, but only while the Insured is in or upon such premises or surface vehicle for the purpose of beginning, continuing or completing *the air trip designated in the Schedule.*" (Emphasis added.)

All of the above provisions are in black ink, except for the portions of the "SCHEDULE" filled in with blue ink. In addition, in very light-faced, pale green printing, the following words appear:

"Read Carefully
This Policy Is Limited
To Aircraft Accidents
on Scheduled Airlines"

These words are set on a diagonal and are covered with the small black type of the long contractual provision set out above, making both the green printing and the black printing over it difficult to read. A casual reader would be likely to fail to read the green type at all.

The issue in this case is whether the fatal flight was "a regular, special or chartered flight * * * contracted for by, the Military Air Transport Service (MATS) * * *,"[1] since none of the other specified types of flights applies.

This Court has concluded, for reasons to be set forth hereinafter, that the fatal flight was covered by the in-

---

1. It is conceded by plaintiff that the fatal flight was not "operated * * * by" MATS, since it was not operated by MATS personnel and since the aircraft itself was not owned by the United States Air Force. The issue is thus limited to the above-quoted portion of the policy dealing with flights "contracted for" by MATS.

surance policy, and that plaintiff is therefore entitled to recover.[2]

■■ It is hornbook law that ambiguities in a standard-form contract are generally to be resolved against the party who drafted the document. In this case, this principle requires this Court to construe the insurance policy liberally in favor of the purchaser and his widow, the plaintiff herein. Smith v. Indemnity Ins. Co., 115 U.S.App.D.C. 295, 298, 318 F.2d 266 (1963). The policy must therefore be interpreted from the point of view of the ordinary understanding of a reasonable person in the position of Mr. Messina at the time of purchase. "We all know that a contract of insurance, drawn by the insurer, must be read through the eyes of the average man on the street or the average housewife who purchases it. Neither of them is expected to carry· the Civil Aeronautics Act or the Code of Federal Regulations when taking a plane." Lachs v. Fidelity & Cas. Co., 306 N.Y. 357, 118 N.E.2d 555, 558 (1954).

There are a number of important ambiguities in the policy. First, there is a clear conflict between the light green print, which limits coverage to scheduled airlines, and the boldface heading and body of the contract, both of which are broader in coverage, including flights by MATS, which may well be nonscheduled. Second, the policy specifically covers all "regular, special, or chartered" flights by the designated airlines, while the light green print limits coverage to scheduled airlines; to the ordinary reader, these provisions would appear to conflict with

each other, since such reader would be unlikely to differentiate chartered flights run by "scheduled" airlines from chartered flights run by "non-scheduled" airlines. In short, the fact that coverage extends to "regular, special, or chartered" flights would be more important to the ordinary reader than the limitations as to various kinds of airlines, the technical definitions of which would not be understandable even to a diligent reader. The reference to "special" and "chartered" flights would have led a reasonable person in Mr. Messina's position to believe that the air-taxi flight was covered—unless some clear warning to the contrary can be discovered in the terms of the policy.

No such clear warning exists. In fact, other provisions in the policy would have reinforced the conclusion that the air-taxi flight was covered. Three specific references to coverage for the entire air-trip described in the "SCHEDULE" (filled in by the purchaser) would have led the ordinary reader in Mr. Messina's position to conclude that all connecting flights between the "point of departure" (Tachikawa) and the "destination" (Washington, D. C.) would be covered. Two of these references are quoted above: one extending coverage to injuries received "during any portion of the first one way or round trip which is made by the Insured * * * *between the Point of Departure and the Destination designated in the Schedule* * *;" the other dealing with ground transportation "for the purpose of beginning, con-

2. At the request of the Court, the parties have briefed the question of which law should govern the substantive issues in this case. Defendant has argued that the law of Japan should govern, since the contract was purchased in Japan, and that since plaintiff has offered no proof of Japanese law, the case should be dismissed. The Court, however, agrees with plaintiff that it would be contrary to the intention of the parties and contrary to sound judicial administration to apply the law of Japan to the interpretation of this contract when the contract was purchased by an American citizen passing through Japan on his way back to the

United States to his permanent residence in Maryland, and was sold by an American insurance company with home offices in Nebraska. See Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954). American contract law will therefore be applied. The Court need not decide which American jurisdiction governs, since neither party has suggested that the courts of any one state would decide the issues presented herein any differently from the courts of other states. In any event, the court would be justified in assuming that Japanese law contains the same governing principles of the law of contracts.

tinuing or completing *the airtrip designated in the Schedule.*" (Emphasis added.) The third reference is in the policy clause dealing with the effective date of the policy: *"This insurance shall commence* on the Effective Date at 12:01 A.M., Standard Time *at the Point of Departure, and shall terminate* either *upon completion of the airline trip described in the Schedule* or upon expiration or surrender for refund or credit of said transportation ticket, but in no event shall this insurance extend beyond a period of twelve months." (Emphasis added.) The impression left by these provisions that the policy covers the complete airtrip from point of departure to point of destination is made even stronger by the fact that defendant has conceded that both the completed trip from Japan to Travis Air Force Base and the projected trip from San Francisco to Washington, D. C. are specifically covered by the policy. It thus would have required clear warning that an intermediate air-taxi flight would not be covered in order to exempt the flight from Travis to San Francisco from the continuous coverage implied in the policy. Not only is such warning completely missing; even if it had existed it would have been made ambiguous and obscure by the specific coverage extended to "special" and "chartered" flights, as discussed above.[3]

■■ There is one further fact which bears upon the proper interpretation of this policy. Mr. Messina filled in the name and address of his wife on the back of the policy, and mailed it to her before he left Tachikawa Air Force Base in Japan.[4]

It is in the light of these considerations that the Court must interpret the proviso that the air-taxi flight is covered only if it is a flight "contracted for by the Military Air Transport Service (MATS) * * *." If the ordinary person in Mr. Messina's position had inquired whether the flight was or was not "contracted for" by MATS, he would have been shown a document called a "Revocable Permit." This document, signed by the Base Commander of Travis Air Force Base (a base assigned at that time to MATS; the commander was an officer of MATS), and by the President of Travis Air Taxi Service, permitted the Air Taxi Service to use without charge the landing and parking facilities of the base "for the express purpose of providing air taxi service from Travis Air Force Base to the San Francisco bay area." The document did not purport to grant the Air Taxi Service exclusive rights. The permit was to be effective "until terminated," either mutually at any time, by either party on thirty-day written notice, or by the Base Commander for non-compliance

---

3. The fact that the Army considered Mr. Messina to be in "duty status" until his arrival at Brentwood, Maryland, reinforces the conclusion that his entire trip was a continuous one. This conclusion is fortified by the additional fact, supported by regulations offered in evidence by plaintiff, that Mr. Messina could have been reimbursed for the air-taxi flight out of Army funds. However, the Court is not relying upon these facts as essential to its decision. The Court need not pass upon defendant's objections to these conclusions, advanced on various evidentiary grounds; if it were necessary to pass upon these items of evidence, defendant's objections would be overruled.

4. Although it is not essential to this Court's decision, the Court on the basis of the record before it concludes that the defendant provided no duplicate of the insurance policy. The existence of any such duplicate as a matter of standard practice is a fact peculiarly within the knowledge of the defendant, and defendant having produced no evidence thereon, it is permissible to infer that no duplicate copy was provided. Thus when Mr. Messina arrived at Travis and decided to take the air-taxi flight, he would have had only his memory to tell him whether or not the air-taxi flight was covered under the policy. In these circumstances, the impression that the policy covered the continuous flight from Japan to Washington, D. C. would have been stronger than ever. See Steven v. Fidelity and Cas. Co., 58 Cal.2d 862, 27 Cal.Rptr. 172, 377 P.2d 284, 294 (1962), where the fact that an insurance policy had been mailed influenced the court in concluding that an air-taxi flight was covered.

or emergency conditions. In return for the right to land and take off, the Air Taxi Service agreed to transport passengers on the following priority basis:

FIRST PRIORITY: Department of Defense personnel travelling on official orders at the expense of the United States Government.

SECOND PRIORITY: Military personnel travelling on emergency leave.

THIRD PRIORITY: All Department of Defense personnel, including contract employees and dependents thereof.

FOURTH PRIORITY: Non-priority seating will be on a first-come, first-serve basis.

The document set maximum prices. It also incorporated by reference certain FAA safety requirements, and in a supplement specified minimum visibility ceilings more stringent than those required by the FAA. According to the supplement, passengers were to be carried on multi-engine aircraft only. In addition, the following provision governed the service to be provided:

"Aircraft will be non-scheduled and will depart at discretion of [Travis Air-Taxi Service]. However, weather conditions permitting, *flights will depart after no longer than two hours after one passenger has con-*

tracted for the flight service." (Emphasis added.)

■■ Both parties agree that a contract is an agreement between two or more parties to do (or not to do) a certain thing, based upon sufficient consideration. Even though the Air Taxi Service and the Base Commander did not label the above document a "contract," it has all the essential elements of a contract, at least from the point of view of a reasonable man in Mr. Messina's position had he been shown the document. There is benefit flowing to both parties—to the Air Taxi Service from the fares it can collect from persons flown from Travis; to the Base Commander (and MATS) from the quicker connections between air fields and the priority seating arrangements.[5] There is also a detriment to each party—to the Air Taxi Service in being bound to supply service no longer than two hours after one passenger has requested the service; and to MATS in the wear and tear upon the runways and other facilities. In return for the promise by the Air Taxi Service to provide service even when there was only one person desiring it, and to provide such service on a priority service, the Base Commander promised for MATS to let the Air Taxi Service use the facilities of the base. So long as the agreement was in force, each party was obligated, and each benefited. The essential requisites of a contract were thus present.[6] This Court

---

5. In a memorandum dated February 2, 1959, (offered in evidence by plaintiff) from the Base Commander to the Military Traffic Management Agency, the Base Commander described in great detail the connecting services available between Travis and San Francisco Airport in his request for permission to grant approval to the Air Taxi Service to begin operations between the two airports. Defendant objects to the admission into evidence of the opinion of the Base Commander that existing surface connections were inadequate since the Base Commander was not present for cross-examination; but defendant does not object to the admissibility of the supporting factual data—indicating surface travel times varying between one hour and three-quarters to three hours and one-half.

This factual data speaks for itself in supporting the Court's conclusion that MATS received a benefit from granting the Air Taxi Service the right to operate between Travis and San Francisco Airport.

6. Defendant argues that the Base Commander had no authority to "contract" on behalf of MATS, although he does not question the fact that the Base Commander had authority to issue the so-called "revocable permit." Since the Base Commander did have authority to do what he did in issuing the permit, and since the Court has construed that permit as a contract for the purposes of this case, any lack of authority to "contract" on behalf of MATS in some other regard is irrelevant to this case. In an event, since

has therefore concluded that for the purposes of determining whether this flight was covered by the insurance policy, the flight was one "contracted for by" MATS.[7]

■■ Considering the insurance policy as a whole and the governing principles of law, this Court has concluded that plaintiff has sustained her burden of proving by a fair preponderance of the evidence that she is entitled to recover the proceeds of the insurance policy purchased by her husband.

■ The Court will also award plaintiff interest on the face amount of the policy from March 16, 1960, the date on which the defendant company rejected plaintiff's demand. This award of interest is required by D.C.Code, § 28–2707,[8] since the face amount of the policy is a liquidated amount, and since interest is payable by law or usage in such cases, 3 Appleman, Insurance Law and Practice §§ 1581–1584 (1941 ed.). Defendant argues that D.C.Code, § 28–2708,[9] permitting discretionary interest, applies. "But that provision [D.C.Code, § 28–

2708] is not applicable where the action is for recovery of a liquidated indebtedness. In such case section 28–2707 D.C. Code (1951) applies." Blustein v. Eugene Sobel Co., 105 U.S.App.D.C. 32, 36, 263 F.2d 478, 482 (1959). See also Rosden v. Leuthold, 107 U.S.App.D.C. 89, 92, 274 F.2d 747 (1960). Plaintiff would be entitled to interest from the date of demand and proof of death. See Royal Indemnity Co. v. Woodbury Granite Co., 69 App.D.C. 364, 369, 101 F.2d 689 (1938); 3 Appleman, Insurance § 1584. But apparently plaintiff does not know the actual date of demand, and is content to request interest only from the date the demand was rejected. Since the insurance policy specifies no rate of interest, the statutory six per cent per annum will be applied. D.C.Code, § 28–2701.

Judgment will therefore be entered in favor of plaintiff in the amount of $50,-000 plus interest at six per cent per annum from March 16, 1960.

This memorandum will be considered as findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

the issue in this case is whether a reasonable man in Mr. Messina's position would have interpreted the insurance policy as covering this flight as one "contracted for by" MATS, such a reasonable man would have been justified in relying upon the Base Commander's apparent authority (as distinct from actual authority) in "contracting" on behalf of MATS.

7. Differences between the language of the insurance policy in the present case and policies in other cases, cited both by plaintiff and defendant, make the other cases not persuasive on the issues presented in the present case. See McBride v. Prudential Ins. Co., 147 Ohio St. 461, 72 N.E.2d 98 (1947) (interpreting "regularly scheduled passenger flight of a commercial aircraft" to bar coverage of a plane hired for a hunting trip); Lachs v. Fidelity & Cas. Co., 306 N.Y. 357, 118 N.E.2d 555 (1954) (holding the words "scheduled airline" ambiguous enough to extend coverage to the particular flight involved, in an "Airline Trip Insurance" policy purchased from an automatic vending machine); Thompson v. Fidelity & Cas. Co., 16 Ill.App.2d 159, 148 N.E.2d 9 (1958) (interpreting "scheduled air carrier" as excluding coverage

of the particular flight involved). None of these cases involved the phrase: flights "contracted for by" MATS.

8. "In an action in the United States District Court for the District of Columbia to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid." D.C.Code, § 28–2707.

9. "In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only; but nothing herein shall forbid the jury, or the court, if the trial be by the court, from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff. * * *" D.C.Code, § 28–2708. Even if this provision did apply in the present case, the Court would award such interest since it is necessary "to fully compensate the plaintiff" for the amount which the proceeds could have earned since the time when such proceeds were due and payable.