EILEEN SHNEIDERMAN, Plaintiff, *v.* METROPOLITAN CASUALTY COMPANY OF NEW YORK, Defendant.

First Department, November 9, 1961.

*Herman V. Traub* (*Ernest Walton* with him on the brief), attorney for plaintiff.

*Benjamin H. Eisen* of counsel (*Martin A. Crean,* attorney), for defendant.

EAGER, J. This is a submission of a controversy on agreed statement of facts pursuant to sections 546 to 548 of the Civil Practice Act. Involved is the right of the plaintiff to recover the death benefit under a special disability insurance policy issued by defendant to David Seymour on February 1, 1953. The policy provided *inter alia* for payment of the principal sum of $5,000 to plaintiff, as the designated beneficiary, for loss of life of the insured resulting from accidental bodily injury. The policy, however, contained the express exclusory provision that " This insurance does not cover death  *  *  *  caused by war or any act of war or sustained by the Insured while in military or naval service of any country at war, and in the latter event the pro rata unearned premium will be returned to the Insured."

At the time of the issuance of the said policy, the insured, David Seymour, was by occupation a photographer-journalist and he continued in such occupation until time of death. He was killed on November 10, 1956 at El Quantara in the Suez Canal zone while engaged on a photographic journalistic assignment.

In October, 1956, prior to the death of the insured, war, with extensive military and naval action, had been commenced by the British, Israeli and French governments against the Egyptian government to seize control of the Suez Canal. Following the hostilities between the British, Israeli and French governments on the one hand and the Egyptian government on the other hand, an agreement to cease fire effective November 6, 1956 was entered into by these nations.

The insured's death on November 10, 1956, occurred following the agreement to cease fire. The insured, at time of death, was attempting to cross from the British-French lines to the Egyptian side with a party exchanging wounded. The insured and a French photographer were traveling with the party in a jeep. They were killed when they were fired upon by the Egyptians and their jeep plunged into a nearby canal. Upon the foregoing facts, which are agreed, the question is, was the death of the insured "caused by war or any act of war" within the meaning of the exclusory provisions of the policy.

The position of the defendant insurance company is that, at the time of the insured's death, war or a state of war existed between Great Britain, France and Israel on the one side and Egypt on the other side. If this be so, it would follow that the insured's death was an incident thereof and, therefore, not covered by the policy. On the other hand, if the war, within the meaning of the term as used in the policy, had ended, then, for reasons hereinafter set out, it would appear that there was coverage.

By the statement of facts, the parties have stipulated that "An agreement to cease fire, effective November 6, 1956, was entered into by the parties." This was in pursuance of arrangements under a resolution of the General Assembly of the United Nations. It is significant that, following this cease fire on November 6, 1956, the warring nations did not thereafter engage in maneuvers or hostilities for the purpose of gaining military or naval advantage. Such incidents of violence or minor fighting as did thereafter occur were not in the furtherance of the prosecution of the war as such.

That a war may be terminated by the actual cessation of hostilities is recognized by authorities in international law and by judicial decision. While it is written in textbooks that a regular or normal way of ending a war is by a treaty of peace or by conquest and annexation, it is conceded by the authors that actual cessation of hositilities pending peace preliminaries may mark the ending of a war. (Wheaton, International Law, "War" [7th ed.], p. 615; 2 Oppenheim, International Law, "Disputes, War and Neutrality" [7th ed.], § 262, p. 597.) Where, as here, the agreement by warring nations to cease fire was with the view toward the final termination of hostilities, it was an agreement to end a war. Thereupon, there was a termination in fact of overt and organized hostilities in furtherance of the war. The period following was a period for settlement of disputes by negotiation as distinguished from a period of war. The war in fact was then ended and the absence of a

formal peace treaty is of no significance. In truth, the resolution of the United Nations is to be considered here as having the same effect of terminating the war and restoring peace as a traditional treaty of peace.

The defendant, however, points particularly to the continuance of sporadic raids and miscellaneous fighting along the Israeli border occurring from time to time, and argues that, in reality Israel and Egypt were at war or in a state of war continuing from the time of the declaration of independence by Israel in 1948 to the present time. The insured's death, however, was not an incident of any such alleged state of war. As a matter of fact, his death did not occur in the Israeli-Egyptian zone but rather in the Anglo-French-Egyptian zone. Immaterial here, therefore, are the incidents of violence between Israel and Egypt which were unconnected with the war in the Suez Canal zone and which, in any event, did not cause the death of the insured.

Of course, our ultimate aim here is to find and give effect to the intention of the parties in contracting for exclusion from coverage for death '' caused by war or any act of war ''. The words used are to be taken and read in their plain and ordinary sense. '' Such meaning must be given to the terms used as would be ascribed to them by the average man in applying for insurance and reading the language of the policy at the time it was written (*Lewis* v. *Ocean Acc. & Guar. Corp.*, 224 N. Y. 18, 21; *Silverstein* v. *Metropolitan Life Ins. Co.* [254 N. Y. 81]) '' (*McGrail* v. *Equitable Life Assur. Soc.*, 292 N. Y. 419, 424).

We are to take cognizance of the fact that an insurance policy is generally a contract with the average man who presumably is unfamiliar with the existence of a state of war from the strictly political, miltary and/or legal standpoint. Such a man would read the term war in a policy exclusory clause in the sense that the term is commonly used and understood in the every day expression rather than as used and understood in international relations or military affairs. Thus '' [t]he common understanding of the meaning of ' war,' as related to its likelihood to be the cause of death, and the interpretations given to the usage of such a term in the current of judicial history, would be controlling.'' (*Vanderbilt* v. *Travelers Ins. Co.*, 112 Misc. 248, 250, affd. 202 App. Div. 738, affd. 235 N. Y. 514.)

'' War, in the practical and realistic sense in which it is commonly used, refers to the period of hostilities and not to a technical state of war which may exist after the fighting has ended. New York Life Ins. Co. v. Durham, supra, 10 Cir., Utah, 166 F. 2d 874, 876; Stinson v. New York Life Ins. Co., supra, App. D. C., 167 F. 2d 233, 238, 239; Kaiser v. Hopkins, supra,

6 Cal. 2d 537, 58 P. 2d 1278, 1279.'' (*Darnall* v. *Day*, 240 Iowa 665, 671.) So, '' the plain, ordinary and generally accepted meaning of the word ' war ' is war in fact.'' (*Wilkinson* v. *Equitable Life Assur. Soc.*, 2 Misc 2d 249, 252.) In the mind of the ordinary or average man, a war is considered at an end on the final cessation of hostilities following an armistice or cease fire looking toward complete peace. For example, a common expression, when the fighting stops, heard in the street or seen in the headlines, is the '' War is over ''.

Consequently, in connection with the interpretation of private contracts, the courts have treated the actual cessation of hostilities as synonymous with the cessation of war. (2 Oppenheim, *op. cit, supra*, p. 547.) (See, also, *Matter of Jones* v. *Schneer*, 270 App. Div. 1027; *Malbone Garage* v. *Minkin*, 272 App. Div. 109, affd. 297 N. Y. 677; *Michael Tuch Foundation* v. *Hazelcorn*, 187 Misc. 954, affd. 188 Misc. 1046; *Matter of Zinno* v. *Marsh*, 30 Misc 2d 171.) Therefore, the term war when used in an exclusory clause of an insurance policy is generally construed as referring to the period of actual hostilities, that is, in the absence of context plainly having the effect of broadening the term beyond such limits. (*New York Life Ins. Co.* v. *Bennion*, 10th Cir., 158 F. 2d 260, cert. denied 331 U. S. 811; *New York Life Ins. Co.* v. *Durham*, 166 F. 2d 874, *supra*; *Stinson* v. *New York Life Ins. Co.*, 167 F. 2d 233, *supra*; *Beley* v. *Pennsylvania Mut. Life Ins. Co.*, 373 Pa. 231; *National Life and Acc. Ins. Co.* v. *Leverett*, 215 S. W. 2d 939 [Tex. Civ. App.].)

Moreover, in limiting the meaning of the terms '' war '' and '' act of war '' as used in the exclusory clause to the meaning of war in its real and practical sense, we are giving effect to the apparent intention of the parties. The usual purpose of exclusory clauses, such as the one here, is to protect the insurance company from extraordinarily hazardous risks; and from the insurance company's standpoint, the risk of loss of life incident to actual warfare is the risk that it must guard against. The provision for exclusion of liability from such a risk is necessitated by the inability to properly gauge premiums to cover such a risk and the need of protecting the company from financial disaster which could result from wholesale death occurring from actual warfare. Thus, reasonably, an insured could be expected to understand that he was not to be insured against death occurring during such a calamity. On the other hand, a company in writing a life policy would be under no such necessity of protecting itself against the miscellaneous acts of violence which might occur after a cease fire agreement. Loss of life as a war hazard from the insurance company's view does not exist

at all or exists to a very limited extent from the time when the parties have agreed to end hostilities. So, reasonably, an insured, in the absence of plain provision to the contrary, would expect to be covered for death occurring while engaged in his normal occupation after the termination of the war as such. (See *Mutual Life Ins. Co. of N. Y.* v. *Davis,* 79 Ga. App. 336; *Gagliormella* v. *Metropolitan Life Ins. Co.,* 122 F. Supp. 246.)

In any event, we are bound to consider the policy as a whole and, on such consideration, construe it liberally to give effect to the purpose for which it was written. It is, therefore, of particular significance that we have here a special disability policy and that the defendant wrote it with the understanding that the insured's occupation was that of photographer journalist and a member of the American Society of Magazine Photographers, Inc. It was written under the particular premium classification for such occupation and contained provision (par. 12) for adjustment of premium if the insured should change his occupation to a less hazardous one. As written, therefore, it was generally intended to include indemnity for disability and loss of life caused by any accidental bodily injury resulting from any hazard incident to the insured's occupation. In order to limit such generally intended coverage, the company was bound to use '' clear and unmistakable terms so that no one could [may] be misled '' (see *Birnbaum* v. *Jamestown Mut. Ins. Co.,* 298 N. Y. 305, 313). '' If exclusion of liability is intended which is not apparent from the language employed, it is the insurer's responsibility to make such intention clearly known '' (*Ætna Cas. & Sur. Co.* v. *General Cas. Co.,* 285 App. Div. 767, 770; *Sperling* v. *Great Amer. Ind. Co.,* 7 N Y 2d 442, 447). Thus, the rule which dictates construction of any ambiguity against the insurer has particular application where exclusions are involved. (*Matsuo Yoshida* v. *Liberty Mut. Ins. Co.,* 240 F. 2d 824, 826; *Mohawk Val. Fuel Co.* v. *Home Ind. Co.,* 8 Misc 2d 445; also *Hartol Prods. Corp.* v. *Prudential Ins. Co.,* 290 N. Y. 44.)

Here, the company used ambiguous terms. In generally excluding from coverage death '' caused by war or any act of war '', it used terms which are incapable of exact definition and wording which is susceptible to different meanings (see *Thomas* v. *Metropolitan Life Ins. Co.,* 388 Pa. 499; *New York Life Ins. Co.* v. *Bennion,* 158 F. 2d 260, 265, 267, *supra*). The uncertainty in the language used is chargeable to the company, and any doubt in the construction to be adopted must be resolved against it. Thus, reasonably, the exclusory clause should be limited in its application to a death occurring as a direct consequence of war. Here, the direct cause of death *was not the war or an act of war*

but an *unexplained act of violence* following the ending of the war.

The spasmodic incidents of violence in the war area following the cease fire agreed upon by all the warring nations were nothing more than in the nature of the turbulence, disruption and disorder which many times follow a war. The insured's death, occurring during such an incident, was merely related to the war in the sense that it resulted from the aftermath thereof. Had defendant company desired to exclude from coverage a death from acts of violence which might follow warfare, it should have spelled this out clearly rather than to generally circumscribe its risk to the point of war and acts of war.

*Welts* v. *Connecticut Mut. Life Ins. Co.* (48 N. Y. 34) is somewhat in point. There, the life policy issued in the time of the Civil War provided that the insured (p. 35) '' was not insured by said policy against death from any of the casualties or consequences of war or rebellion, or from belligerent forces in any place where he may be.'' The insured was killed on October 31, 1864, in the northern part of the State of Tennessee, by pistol shots while employed by the United States Government in constructing a bridge for use by its military authorities. It appeared, however, that he was not in the military service and was not working in the sphere of actual military engagements, and that he was shot by a party of four men who wore no uniforms and who thereupon robbed the other men employed there. The court affirmed a recovery upon the policy, saying (p. 40): '' The war or rebellion may be a remote cause of the death, as it was the cause of disorder and lawlessness; but the proximate cause is murder and highway robbery.'' So, here, in the case at bar, the cause of death was not the war or an act of war but an unexplained incident of violence following the war.

In view of the foregoing, we conclude that the plaintiff should have judgment against the defendant for $5,000, with interest from December 1, 1956, and with costs.

STEUER, J. (dissenting). I dissent from the opinion of the majority. I am constrained to this conclusion not by any marked disagreement with the principles of law stated in the opinion but with their applicability to the facts likewise stated with accuracy, which I find unexceptionable. It is a correct statement of the law that the continuance of war as defined in the policy is not dependent upon the diplomatic or political arrangements made between the belligerent nations and that what is to be understood by the term is the period of actual hostilities. This period may be greater or less than the formal state of war

originated by a declaration and terminated by a treaty or an armistice. Thus, it would be indisputable that a condition or an act of war existed at Pearl Harbor prior to any formal declaration, and the same is true if organized hostilities continue beyond the time that either or both of the belligerents have signified their intention to desist from such activities. The question is whether in fact they do so desist.

While it is doubtless true that sporadic acts of individuals, even though induced by the disruptive conditions following a war, do not constitute a prolongation of the war or an act of war, the same is not true of organized military actions conducted by one of the belligerents. The facts here show that the deceased was killed as a result of gunfire from a position regularly maintained by one of the belligerents as his jeep was approaching that position. There is nothing to show that any motive personal to the soldiers who fired the barrage motivated their act. This distinguishes the *post bellum* cases cited in the majority opinion. Nor is there any showing that the act was the result of unauthorized or disorganized pillage or rioting. The only inference that can be drawn from the meager statement of facts presumably embracing all that can be ascertained of the incident is that the Egyptian forces were engaged in the continuation of hostilities despite their equivocal acceptance of the United Nations recommendation for a cease fire.

No explanation is forthcoming as to why the plaintiff's jeep was fired upon by regular troops from a regularly maintained position. This could only mean that an act of war was being perpetrated by one of the belligerents contrary to its declared intention. As we have already seen, the declared intention is not the criterion. It is what is actually done.

The controversy should be determined in favor of the defendant.

VALENTE, J. P., McNALLY and STEVENS, JJ., concur with EAGER, J.; STEUER, J., dissents in opinion.

Judgment for plaintiff against defendant for the sum of $5,000, with interest from December 1, 1956 and with costs.

Settle order on notice.