**NATIONAL SCREEN SERVICE CORPO-
RATION, Plaintiff-Appellee,**

v.

**UNITED STATES FIDELITY AND
GUARANTY COMPANY,
Defendant-Appellant.**

**No. 425, Docket 29674.**

United States Court of Appeals
Second Circuit.

Argued June 13, 1966.

Decided Aug. 3, 1966.

Hays, Circuit Judge, dissented.

Walter S. Beck, New York City (Phillips, Nizer, Benjamin, Krim & Ballon and Theodore H. Friedman, New York City, on the brief), for plaintiff-appellee.

James M. Gilleran, New York City (John J. O'Connor, New York City, on the brief), for defendant-appellant.

Before HAYS, ANDERSON and FEINBERG, Circuit Judges.

ANDERSON, Circuit Judge.

National Screen Service Corporation, the insured, commenced the present action on an insurance policy in the Supreme Court of New York seeking recovery against United States Fidelity and Guaranty Company, the insurer, for refusing to defend and pay various claims asserted by third parties against National. The suit was removed to the District Court for the Southern District of New York, on the basis of diversity, pursuant to 28 U.S.C. § 1441 (1964 ed.). The District Court rendered judgment for National and USF&G appeals.

The facts are these: National, the appellee, is engaged in the business of producing and distributing motion picture "trailers," more commonly known as coming attractions and other motion picture display material. None of the material was ever sold to exhibitors, but rather

was licensed for theatre use. When the trailers were no longer of any use they were returned to National, which in accordance with a continuing agreement with the Eastman Kodak Company, sent all worn out film which it could no longer use to that company at Rochester, New York. The film was shipped, by transportation selected and paid for by National, to Kodak's Rochester facility where the film was examined to determine whether there was sufficient silver compound remaining on the face of the film to make salvage feasible. In practice Kodak accepted and paid for all scrap film which was tendered to it, though the amount of payment varied according to suitability of the film for salvage. Kodak had the right, however, to reject any shipment.

The present suit involves an incident which occurred on June 24, 1954. National had in force on that date a "Comprehensive General Liability Policy" issued to it by the appellant, USF&G, on December 31, 1953 for a one year period. The policy protected National against all potential liability for negligence in connection with the conduct of its business, which was declared on the face of the policy to be "motion picture previews-displays," except to the extent that the policy explicitly excluded coverage for certain risks. The policy obligated USF&G to defend National in any suits brought against it "alleging such injury, sickness, disease or destruction and seeking damages on account thereof * * *"; it also contained a number of exclusion clauses, two of which are particularly relevant to this case. First, the so-called "products hazard exclusion" provided that the policy did not cover "products hazard as defined in the policy." The definition was as follows:

> "The term 'products hazard' means (1) the handling or use of, the existence of any condition in or a warranty of goods or products manufactured, sold, handled or distributed by the Named Insured, other than equipment rented to or located for use of others but not sold, if the accident occurs after the

Insured has relinquished possession thereof to others and away from premises owned, rented or controlled by the Insured or on premises for which the classification stated in Division (a) of the declarations or in the Company's manual excludes any part of the foregoing;"

It was apparently the purpose of that exclusion to place a certain limit on the coverage for products liability of the kind imposed by MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916) (Cardozo, J.). See also La Rocca v. Farrington, 301 N.Y. 247, 250, 93 N.E.2d 829, 830 (1950). Second, there was a clause which excluded liability for "injury to or destruction of property arising out of * * * blasting or explosion * * * while such operations are being performed by the Named Insured."

A few days before June 24th, National had filled with scrap film and sealed several steel drums, and readied them for shipment to Kodak. On June 24th the Wayland Transfer Co. called for the drums at National's Charlotte, N. C. premises and furnished National with a non-negotiable uniform straight bill of lading. Wayland had been retained by the Southern Railway Co. to make the pick up and to transport the drums to the railroad's local freight depot, whence they were to be shipped to Kodak by rail. After the drums arrived at the depot they remained on the outdoor platform for several hours until they were moved inside. Later in the day a fire, allegedly caused in part by the combustion or explosion of National's film, occurred at the depot, causing damage to the property of a number of innocent third parties, who in due course asserted claims against National for negligence and sought to recover for their losses. National, in turn, gave timely and sufficient notice of the claims against it to USF&G and requested that the insurance company undertake to defend the claims. After an investigation, however, USF&G disclaimed any liability, for two reasons: first, on the ground that liability was

excluded under the "products hazard exclusion," and second, that the damage was caused by explosion, a risk which was explicitly excluded from coverage. As a result of the insurance company's refusal, National had to retain its own local counsel in North Carolina. Ultimately the claims were settled for a total of $25,201.50 and legal fees, conceded by USF&G to have been reasonable, were incurred in the amount of $7,500.

In the district court, the trial centered around the issues of whether or not either of the two exclusion clauses precluded coverage for the losses sustained by National. The court submitted for determination by jury the questions of "whether the exclusion clause in the insurance contract covering explosions was applicable to the events in question," and whether or not the loss was occasioned by explosion. A general verdict for the plaintiff was returned. The district judge reserved for his own determination "the question of the applicability of the products liability exclusion clause * * *, the issue of damages and the defendant's post-trial motion to set aside the verdict * * * or in the alternative for a new trial." In a careful opinion the district judge held that the insurer was liable to National. We affirm.

### PRODUCTS HAZARD EXCLUSION

USF&G urges that it was absolved from liability for the loss incurred by National by the terms of the products hazard exclusion, because the loss occurred, in the words of the policy, "after the Insured has *relinquished possession* thereof to others and away from premises owned, rented or controlled by the Insured * * *." (Emphasis added.) The central issue thus is whether National had possession of the film at the time of the loss, and that question in turn depends upon whether the word "possession" as used in the policy clause should be read to include the concept of "constructive possession" as well as actual possession.

The trial judge held that (1) National's business, was such that it was "not in a position to require it to purchase products liability coverage and that as such the products hazard exclusion would have no application to the facts present * * *." He also found that, in any case, the word "possession," as used in the exclusion clause, included constructive as well as actual possession, and that therefore, since National still retained constructive possession of the drums at the time of the loss, USF&G remained liable on the policy.

We think that it is not necessary to reach the question of whether National's business was such that it should have carried products liability insurance, as it is our opinion that the products hazard exclusion did not affect the coverage in this case.

Since the policy in question was issued by USF&G from its principal office in New York, the law of that state governs this case, as the parties concede. Fleet Messenger Service v. Life Insurance Company of North America, 315 F.2d 593 (2d Cir. 1963). We are of the opinion that on the facts here presented the New York courts would construe the word possession broadly to include constructive as well as actual possession. The relevant case law in New York evinces a very strong tendency to favor the insured when construing words of ambiguous meaning in insurance contracts. There is a general tendency in a majority of jurisdictions to apply the principle of *contra proferentem* and thus to choose the construction most favorable to the insured (see 1 Couch, Insurance § 15:73 (2d ed., Anderson ed. 1959); 3 Corbin, Contracts § 559 (1960)). New York clearly and unequivocally adheres to this rule.

The appellant argues that "possession" must be defined to include only actual possession, because "a contract of insurance, drawn by the insurer, must be read through the eyes of the average man in the street or the average housewife who purchases it." That particular formulation of the plain meaning rule is taken from Lachs v. Fidelity & Casualty Co. of New York, 306 N.Y. 357, 364, 118 N.E.2d

555 (1954). Somewhat different statements can be found in other New York cases. E. g., Abrams v. Great American Ins. Co., 269 N.Y. 90, 92, 199 N.E. 15, 16 (1935); Hartol Products Corp. v. Prudential Ins. Co., 290 N.Y. 44, 49, 47 N.E.2d 687, 690 (1943).

The appellant relies strongly upon the *Abrams* case which concerned a policy issued to cover a jeweler's loss "arising from any cause whatsoever except * * * (a) Loss or damage or expenses by or resulting from theft, conversion or other act or omission of a dishonest character * * * on the part of * * * any person to whom the property hereby insured may be entrusted by whomsoever for any purpose whatsoever * * *" The decision turned upon whether the word "theft" in its ordinary sense included larceny by trick, and whether the word "entrusted" in its ordinary sense included delivery of the jewels into the hands of a thief where the owner made the delivery, confident that the jewels would be used for the purpose which the owner intended and without any knowledge on his part that the recipient was a thief. The court gave affirmative answers to both questions. There was no issue and no discussion in the case of constructive possession. The general rule of interpretation laid down was "[t]he language employed in the contract of insurance must be given its ordinary meaning, such as the average policyholder of ordinary intelligence, as well as the insurer, would attach to it." 269 N.Y. 92, at 93, 199 N.E. 15, at 16. The word "theft" is frequently interpreted not only in ordinary speech but in legal contexts as including larceny by trick, embezzlement and kindred offenses. It is by no means limited to the technical common law definition of larceny. American Insurance Co. of Newark v. Burson, 213 F.2d 487, 490, 43 A.L.R.2d 1 (5th Cir. 1954); Pennsylvania Indemnity Fire Corp. v. Aldridge, 73 App.D.C. 161, 117 F.2d 774, 778, 133 A.L.R. 914 (1941); N.Y. Penal Law, McKinney's Consol. Laws, c. 40, § 1290. The word "entrusted" in the general context in which it was used in the *Abrams* case has no technical legal meaning apart from its use in ordinary speech, as the opinion appears to have recognized.

*Abrams,* decided in 1935, in applying the general rule of construction, said nothing of an authoritative nature with regard to the meaning which the average policyholder of a general business liability policy would give to the word "possession" in the circumstances of the present case.

The criterion for the application of the plain meaning rule contained in Lachs v. Fidelity and Casualty Co. of New York, supra, that the terms of an insurance contract must be read "through the eyes of the average man on the street or the average housewife who purchases it", is particularly suited to, an airplane flight insurance policy purchased by a passenger at an airport through a coin machine and should be confined to that kind of policy. It is not, however, particularly useful in construing the policy at issue in the present case, because few men on the street and few housewives would be purchasers of the specialized business policy with which we are concerned. A better measure is that enunciated in Tonkin v. California Insurance Company of San Francisco Inc., 294 N.Y. 326, 329, 62 N.E.2d 215, 216, 160 A.L.R. 944 (1945) in which the Court of Appeals said, "We know of no better guide in a situation of this sort than 'the reasonable expectation and purpose of the ordinary businessman when making an ordinary business contract.'" See Lumbermens Mut. Cas. Co. v. Town of Pound Ridge, 362 F.2d 430 (2d Cir. June 14, 1966).

For the purpose of this kind of policy the average person is not the housewife purchasing flight insurance but the average purchaser of broad business liability insurance such as the appellee here. It is more than likely that such an insured would be aware that it would still have constructive possession of goods which it has turned over to a delivery man and a common carrier for transportation on the insured's behalf to

another. Particularly where, as here, it still held title to the products and was exposed to liability. National knew that it was the owner of the drums of used films and remained so until title passed on delivery of the goods into the hands of Kodak. It must have been clear both to the insurer and the insured that National, the insured, remained liable under the MacPherson v. Buick Motor Co. rule to third persons who suffered injury or damage even after title passed to Kodak. In view of this the insurer sought to limit the coverage of its policy at the point where the insured lost its power to control the product, as an incident of its ownership, and that power to control passed to Kodak when it became owner of the product. It is hardly likely that it was the reasonable expectation of the insured, or its purpose, to purchase liability insurance to cover its product only while it was inside the gates of its own plant and that it would become its own insurer while the product was in the hands of a delivery man and a common carrier transporting it on National's behalf, and when the chance of injury to third persons was even greater. Nor is it logical to suppose that the insurer thought or understood that its policy was so limited. Therefore, it is apparent that the general rules of interpretation of insurance policies adopted by the New York courts lead to the conclusion that the word "possession" as used in the exclusion clause of the policy in question should be construed to include "constructive possession."

Even putting this determination aside, however, there was certainly a question whether or not under the circumstances of this case, the word "possession" meant not only actual but also "constructive possession." This in itself created an ambiguity in the "products hazard" exclusion clause. The appellant insurance company does not dispute that the appellee had constructive possession, as the trial court found, but asserts that the word "possession" in the exclusion clause does not include "constructive possession." New York law, however, calls for a liberal interpretation of the terms of insurance policies in favor of the insured.

In Sincoff v. Liberty Mutual Ins. Co., 11 N.Y.2d 386, 230 N.Y.S.2d 13, 183 N.E. 2d 899 (1962) the New York Court of Appeals held that where there is an ambiguous word in an insurance policy the burden which the defendant insurer must carry is to show that the construction it urges is such "that it would be unreasonable for the average man reading the policy to conclude" that a meaning other than that urged by the insurance company was possible and "that its own construction was the only one that fairly could be placed on the policy." 230 N.Y.S.2d at 16. Thus, it would seem that in New York the insurance company can avail itself of the plain meaning rule only in those cases where "such a definition was the *only* one that could 'fairly be placed thereon.'" (Emphasis in original.) 230 N.Y.S.2d at 15. See also Hartol Products Corp. v. Prudential Ins. Co., supra, 290 N.Y. at 49–50, 47 N.E.2d 687. The appellant has not met that test in this case. When that condition is not satisfied the rule is, that where an ambiguous word is used, "such ambiguity should * * * [be] resolved in favor of the insured." Sincoff v. Liberty Mutual Ins. Co., supra, 230 N.Y. S.2d at 16; Fidelity & Casualty Co. of N. Y. v. Groth, 296 N.Y. 788, 71 N.E.2d 470 (1947); Janneck v. Metropolitan Life Ins. Co., 162 N.Y. 574, 57 N.E. 182 (1900). And as the New York Court noted in *Sincoff*, supra, "this rule [of favoring the insured] has particular application where exclusions are involved." 230 N.Y.S.2d at 16. See also Schneiderman v. Metropolitan Casualty Company of N. Y., 14 A.D. 2d 284, 289, 220 N.Y.S.2d 947, 951 (1961); Sperling v. Great American Ins. Co., 7 N.Y.2d 442, 447, 199 N.Y.S.2d 465, 469, 166 N.E.2d 482 (1961); Birnbaum v. Jamestown Mut. Ins. Co., 298 N.Y. 305, 313, 83 N.E.2d 128 (1948). The rule would seem to have special vigor when applied to a policy such as the one involved here which is by its own terms denominated a "comprehensive

general liability policy." Cf. *Sincoff*, supra, 230 N.Y.S.2d at 16, where it was said that "a vague exclusion * * * should not be permitted to prevent indemnity" where the policy was of the kind denominated "all risks" by the insurance company.

Appellant relies heavily upon the decision of the Ninth Circuit in General Casualty Co. of America v. Azteca Films, Inc., 278 F.2d 161 (1960), a case which presents a set of facts virtually identical to those in the present case, and in which a contrary result was reached under California law. We feel, however, that the governing law of New York is so strong that we are constrained to reach a different result from *Azteca*.

Furthermore, we find no reason to question the factual determination made by the district court that National did in fact have constructive possession of the drums while they were *in transitu*. And therefore we agree with the result reached by the trial court, that the products hazard exclusion did not relieve USF&G from liability under the policy.

### EXPLOSION EXCLUSION

■ The trial judge charged the jury in substance that they must first "determine whether or not it was the understanding and agreement of these parties that this rider [i. e., the explosion exclusion] applied to them." The jury was further instructed that it was next to decide "whether or not the damage was caused by an explosion." The jury returned a general verdict for the plaintiff. On this appeal the insurance company urges as error the part of the charge in which the jury was asked to determine whether the parties had intended to include the explosion exclusion in the policy. While we agree with the appellant that that issue was not properly in the

case, and the jury should not have been charged as it was, we nevertheless affirm because of the failure of the defense counsel to make any objection to the charge at the trial. F.R.Civ.P. 51. See United States v. Indiviglio, 352 F.2d 276 (2d Cir: 1965), cert. denied 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). The trial judge specifically admonished counsel "to keep their eye open for any objections they care to make." Furthermore, there was ample evidence from which the jury could have concluded that there had been no explosion.

We have considered the other points raised by the appellant, and find them to be without merit.

The judgment of the district court is affirmed.

HAYS, Circuit Judge (dissenting).

I would reverse.

The issue is whether the plaintiff "relinquished possession" within the meaning of the products hazard exclusion.[1] If so, the insurance company is not liable.

The fact that under New York law any ambiguity must be resolved in favor of the insured does not warrant the creation of doubt through a strained or hypertechnical construction of an otherwise plain and unambiguous contract provision. See Doyle v. Allstate Ins. Co., 1 N.Y.2d 439, 443, 136 N.E.2d 484, 487, 154 N.Y.S.2d 10, 13 (1956); Abrams v. Great American Ins. Co., 269 N.Y. 90, 92, 199 N.E. 15, 16 (1935); 1 Couch, Insurance § 15:85 (2d ed. Anderson 1959).

In General Casualty Co. of America v. Azteca Films, Inc., 278 F.2d 161, 165 (9th Cir.), cert. denied, 364 U.S. 863, 81 S.Ct. 103, 5 L.Ed.2d 85 (1960), a case that my brethren concede is "virtually identical" with the case before us, the Ninth Circuit Court of Appeals framed the issue as we must: "whether the

---

1. The policy reads:
"The term 'products hazard' means (1) the handling or use of, the existence of any condition in or a warranty of goods or products manufactured, sold, handled or distributed by the Name Insured, other than equipment rented to or lo- cated for use of others but not sold, if the accident occurs after the Insured has relinquished possession thereof to others and away from premises owned, rented or controlled by the Insured * * *."

clause under examination—because of the word 'possession'—is ambiguous." The court properly concluded:

"it would seem that the word 'possession' as here used would convey to the ordinary mind, the layman, the idea of actual possession. The concept of constructive possession is the sort of concept that would more likely occur to a lawyer. * * * If this [i. e., what the insured did] does not amount to relinquishment of possession, as the term would be understood by a layman, it is difficult to conceive what additional facts and circumstances would be required." Id. at 168.

In the present case the majority seeks to distinguish the *Azteca Films* case on the ground that the "result was reached under California law." But the crucial question is whether there is ambiguity, and California and New York law do not differ in this regard.

The rule in New York is that language in a contract of insurance must be given its "ordinary meaning, such as the average policy holder of ordinary intelligence" would attach to it. Abrams v. Great American, supra at 92, 199 N.E. at 16; see Lachs v. Fidelity & Casualty Co., 306 N.Y. 357, 364, 118 N.E.2d 555, 558 (1954). Compare, e. g., Trousdell v. Equitable Life Assur. Soc., 55 Cal.App.2d 74, 130 P.2d 173, 990 (1942). A court must determine whether there is "ambiguity from the standpoint of a layman, not from that of a lawyer." 1 Couch op. cit. supra § 15:83 at 824. In Abrams v. Great American, supra, the claim of a policyholder, a commercial jeweler, that common words in an exclusion clause should be given a technical legal definition, was rejected because "common words in the policy as 'theft,' 'dishonest,' and 'entrusted' cannot be deemed to have been used as words of art with legalistic implications." Id. at 92, 199 N.E. at 16.

Although Abrams was a commercial jeweler who had purchased a comprehensive policy insuring his business, the majority, still purporting to interpret New York law, limits the rule of *Abrams* and similar cases to "an airplane flight insurance policy purchased by a passenger at an airport through a coin machine." Then, relying on Tonkin v. California Ins. Co., 294 N.Y. 326, 329, 62 N.E.2d 215, 216, 160 A.L.R. 944 (1945), where the court looked at a policy through the eyes of an "ordinary businessman," my brothers argue that such a businessman would be aware of the technical legal concept of "constructive possession." But the New York Court of Appeals in *Tonkin* did not endow their "ordinary businessman" with the powers of a skilled attorney. In "applying this general principle" the court said:

"it is reasonable to suppose * * * that the fair meaning and use of the word 'comprehensive' included those damages which an *ordinary individual* would reasonably and naturally regard as incidental to or flowing from the hazard insured against." (Emphasis added.) Id. at 329, 62 N.E.2d at 217.

In a later case, the Appellate Division made clear that:

"The courts have repeatedly held that the interpretation of a clause in a policy of insurance is to be determined by what it means to the ordinary businessman, not what it might convey on careful analysis to a trained lawyer." Whiteside v. Ins. Co. of Pennsylvania, 274 App.Div. 36, 79 N.Y.S.2d 715, 717 (1st Dep't 1948).

To a layman, whether businessman or housewife, possession means actual or physical control. There is no ambiguity here.

The majority concedes that "the insurer sought to limit the coverage of its policy at the point where the insured lost its power to control the product." There can be no doubt that this point was reached.