FRENCH AMERICAN BANKING
CORPORATION, Plaintiff,

v.

FLOTA MERCANTE GRANCOLOMBIA-
NA, S.A., and Fireman's Fund
Insurance Company, Defendants.

No. 83 Civ. 5095 (KTD).

United States District Court,
S.D. New York.

April 29, 1985.

Healy & Baillie, Cleary, Gottlieb, Steen & Hamilton, New York City, for plaintiff; Sirius C. Cook, James C. Blair, Joanne Zack, Loretta K. Davis, New York City, of counsel.

Hendler & Murray, P.C., New York City, for defendants Fireman's Fund Ins. Co.; Jerome Murray, Michael Maillet, New York City, of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Plaintiff, French American Banking Corporation ("FABC"), commenced this action to recover approximately $4 million plus interest due and payable to it for bills of lading for shipments of coffee issued by defendant Flota Mercante Grancolombiana, S.A. ("Flota"). Flota pledged these bills of lading to FABC in connection with amounts FABC loaned to Colombian Coffee Company ("Colombian"). When Colombian defaulted on the loans, FABC made a demand on Flota for the coffee covered by the bills of lading or the value thereof. Flota denied the genuiness of the bills of lading. FABC alleges that Flota is liable for the bills of lading which were issued by or on behalf of Flota. Alternatively, FABC alleges that because the bills of lading were either forged or counterfeit, defendant Fireman's Fund Insurance Company ("Fireman's") is liable on its Banker's Blanket Bond issued to FABC. Fireman's now moves pursuant to Fed.R.Civ.P. 56(b) for summary judgment dismissing the Amended Complaint as against it. Alternatively, Fireman's moves to dismiss plaintiff's "Eighth Claim, Against Fireman's" in which plaintiff asserts that Fireman's breached its obligation of good faith in connection with the insurance contract. FABC opposes the motion filed by Fireman's.

FABC moved pursuant to Fed.R.Civ.P. 15(a) for leave to file a Second Amended Complaint to assert a claim based on an advance of new value to Colombian on November 18, 1982 on the faith of seven bills of lading which are also claimed by Flota to be fictitious. By Stipulation and Order filed November 27, 1984, the plaintiff was granted leave to file a Second Amended Complaint in the form set forth in plaintiff's motion to amend. Accordingly, plaintiff's motion to amend is denied as moot.

## FACTS

In January of 1981, FABC began to provide financing to Colombian; Colombian was granted an $8 million line of credit to finance the importation of coffee from Colombia. Most of the coffee imported by Colombian was purchased by it from Luis A. Duque Pena E. Hijos, Ltda. ("Duque Ltda.") which is controlled by Luis Duque. Luis Duque's two sons, Victor and Alberto Duque, were principals of Colombian. For the most part, the coffee was transported by truck to Colombian ports where it was loaded on ships, including ships owned by Flota. The bills of lading, which were issued by Flota once the coffee was on board, would be forwarded by Duque Ltda. to Colombian Coffee in New York, which used them to obtain financing from banks such as plaintiff.

The terms of the financing arrangement between FABC and Colombian were set forth in a letter dated January 19, 1981, a General Loan and Security Agreement, an Acceptance Agreement, a Continuing Letter of Credit Agreement, a Uniform Commercial Code ("UCC") Financing State-

ment, and a guaranty executed by Duque Ltda. Through these documents, financing was made available for the inland portion of the shipment as well as the transportation of the coffee from Colombian ports to the United States.

FABC agreed to finance under letters of credit the inland transportation of coffee. Under the financing arrangement pertaining to inland transportation, FABC would issue a letter of credit for the account of Colombian in favor of Duque Ltda. which would be payable against the inland (truck) bill of lading issued at the Duque Ltda. mill. Duque Ltda. would then present to a bank in Colombia the bill of lading and an invoice. Upon notification of presentment to the Colombian bank, FABC would authorize the Colombian bank to make payment to Duque Ltda. FABC would then charge the account of Colombian for the amount. The inland bills of lading financing was for 85 percent of the coffee value; it was limited to an aggregate credit line of $4 million and made payable within 60 days which ordinarily was the maximum time that it took to ship the coffee from the mill to the port.

FABC also provided financing with respect to the oceangoing portion of the shipment for 100 percent of the coffee value. The financing was advanced against ocean bills of lading issued by a steamship company, such as Flota, in a Colombian port. A representative of Colombian would deliver duly endorsed bills of lading to FABC which would then return them to Colombian in exchange for trust receipts which obligated Colombian to pay to FABC any proceeds it received upon the sale of the coffee. Furthermore, by a security agreement perfected by filing, Colombian granted FABC a general security interest in its accounts and inventory.

In or about July of 1982, Banco Nacional, a Colombian bank, collapsed causing liquidity problems for the Duque interests in Colombia. Thereafter, certain coffee proceeds that Colombian had been obligated to remit to FABC under trust receipts were diverted to Colombia. *See* Affidavit of Rodrigo Munoz, FABC's officer in charge of the Colombian account at 7. Specifically, $987,000 of the $5 million diversion had been amounts owed FABC on the trust receipts. *Id.* At one point in July, approximately $9.3 million in financing to Colombian was outstanding.[1]

By mid-November 1982, Colombian had reduced its indebtedness from $9.3 million to $4.4 million. Of the $4.9 million reduction, Colombian made a $2 million cash payment to FABC and supplied current bills of lading for $1.8 million for shipments to Germany and Japan to secure the existing indebtedness owed against overdue trust receipts.[2] In November, FABC agreed to finance a single pre-sold coffee shipment to the United States for $2 million against receipt of seven bills of lading; these are among the bills of lading which Flota claims are fictitious.[3] The bills of lading had been surrendered by FABC for trust receipts. FABC asserts that the decision to provide financing in November of 1982 was based on Colombian's progress in reducing its indebtedness and Colombian's plan to negotiate with another bank, Banque Worms, for a $5–10 million line of credit. By late December, the loans that were outstanding had been reduced to approximately $3.9 million. These loans were secured by $1.8 million in current bills of lading and approximately $2.2 million in current trust receipts.

1. The amounts owing in excess of the $8 million line of credit were advanced after Colombian was granted in mid-July 1982 a $1.5 million credit overline. The overline was extended to finance a particular shipment of coffee pre-sold to General Foods in excess of Colombian's usual export quota.

2. Contrary to prior practice, FABC did not surrender the bills against trust receipts and in January of 1984, Colombian paid $1.8 million against the surrender of the bills.

3. The Ninth Claim in plaintiff's Second Amended Complaint, filed pursuant to Stipulation, is based on the seven November 1982 bills of lading which, plaintiff asserts, were claimed by Flota to be fictitious in an October 24, 1984 deposition of Salvatore A. Conte, Flota's general traffic manager in charge of documentation.

On December 22, 1982, FABC agreed to finance, against bills of lading, another specific shipment of coffee to the United States in the amount of $1.3 million. The financing was conditioned on Colombian's first supplying ocean bills of lading to cover coffee of a value of $537,000 which had been financed earlier but was covered only by inland bills of lading and on Colombian's paying $880,000 which was due on existing trust receipts. On December 30, 1982, Colombian paid the $880,000 and delivered the two ocean bills of lading to cover most of the unaccounted-for coffee. However, because the bills of lading covering the shipment for which FABC was going to extend $1.3 million were for a shipment to Japan rather than the United States, as was originally agreed, FABC refused to finance one set of the Japanese destined bills of lading which lacked "on board" stamps.

In anticipation of the expected $1.3 million advance from FABC, Colombian had already drawn on and delivered to another bank, Societe Generale, a check for $653,000 on December 30, 1982. Although FABC rejected the bills of lading which lacked the appropriate stamps, on January 3, 1983, it advanced Colombian $650,000 to cover the check to Societe Generale. On December 31, 1982, Colombian delivered to FABC three bills of lading with a stated value of $824,000 as a pledge of security for the $650,000 which was advanced on January 3, 1983. The three bills of lading proved to be fictitious.

On January 13, 1983, officials from FABC and Colombian met. Colombian informed plaintiff that on January 14, 1983, it would be paying the $1.8 million secured by bills of lading which had been pledged to FABC in November. (On January 14, 1983, such a payment was made). Colombian also indicated that the $2 million advanced in mid-November would be paid on January 17, 1983. Colombian, however, requested new financing that would enable it to continue its business to facilitate the January 17 repayment. Accordingly, plaintiff agreed tentatively to extend to Colombian $3 million against receipt of new bills of lading which would then be exchanged for trust receipts. Ultimately, however, the ten bills of lading covering coffee with a value of $3,193,000 were never exchanged for trust receipts. The ten bills of lading covered shipments to Europe and Japan but Colombian agreed to replace them with bills of lading covering shipments to the United States within fifteen days. The ten bills of lading pledged by Colombian on January 17, 1983 turned out to be fictitious.

On January 17, Colombian delivered to FABC a $2 million check drawn by General Coffee and made payable to Colombian to be applied to the mid-November $2 million loan. However, as there were insufficient funds in General Coffee's account, FABC, on January 18, 1983, applied $2 million of the $3 million it had agreed to extend to pay off the November loan. Following the January 1983 financing, FABC made no further loans to Colombian but did collect an additional $818,000.

On May 13, 1983, plaintiff commenced an action against Colombian and others in the Supreme Court of the State of New York, and on May 18, 1983, plaintiff first notified Fireman's of its alleged loss. Thereafter, on July 8, 1983, FABC commenced the present action against Flota alone. During this time, plaintiff was participating in bankruptcy proceedings in Florida involving the Duque group. On August 10, 1983, plaintiff submitted its proof of loss to Fireman's. Following additional correspondence between the parties, Fireman's, by letter dated December 2, 1983, informed plaintiff that it could not acknowledge liability. By Memorandum and Order dated May 24, 1984, I granted plaintiff's motion to add Fireman's as a defendant. On May 30, 1984, plaintiff filed its Amended Complaint which included claims against Fireman's for its loss allegedly resulting from its receipt of three bills of lading in December, 1982, and ten bills of lading in January, 1983. In the Second Amended Complaint, plaintiff also seeks to recover for its loss arising from its receipt of the seven bills of lading in November, 1982 and dam-

ages for Fireman's alleged bad faith in processing plaintiff's claim.

In addition to seeking recovery in an amount equal to the alleged value of the coffee represented by the bills of lading, plaintiff claims also that, in reliance on the bills of lading, it refrained from requiring payment of prior outstanding loans of $457,000. Fireman's now moves for summary judgment arguing that FABC's loss is not covered by the bond. For the reasons that follow, Fireman's motion for summary judgment is denied.

### DISCUSSION

The standard governing summary judgment motions is that the movant has the burden of establishing that there exists no disputed material fact and that it is entitled to judgment as a matter of law. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment must be denied if there is a genuine issue of material fact. *Id.*

A. Fireman's Liability Under Banker's Blanket Bond

### I.

FABC's claims against Fireman's are predicated on Bankers Blanket Bond No. HF 242 1206, Insuring Agreement E. The policy insures plaintiff for:

[A] loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

(1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any original

(a) Security,

(b) Document of Title, ... which

(i) bears a signature ... which is a Forgery, or

(ii) is altered, or

(iii) is lost or stolen; ...

(3) acquired, sold, or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any item listed in (a) through (d) above which is a Counterfeit.

*See* Affidavit of John J. Morrissey, Exh. A.

Fireman's moves for summary judgment on plaintiff's Seventh Claim asserting that even if the bills of lading were forged or counterfeit, plaintiff's loss did not "result directly" from FABC having acquired or given value or extended credit on the faith of bills of lading which were forgeries or counterfeit. Fireman's argues that plaintiff's loss was an unsecured credit loss which took place in July of 1982 and that subsequent transactions were merely part of an effort to reduce gradually or to mitigate the loss and to obtain some type of security for the outstanding unsecured balances. FABC contends that the bond covers its loss because Insuring Agreement E provides also that the insured's loss is covered if it resulted directly from the bank having "otherwise acted upon" forged or counterfeit bills of lading. The receipt of the fictitious bills of lading was "acted upon," FABC argues, when further credit was extended to Colombian in January 1983 and when the bank, relying on the bills of lading, abstained from pursuing General Coffee on the check that was written on insufficient funds. Furthermore, FABC asserts that to the extent that Insuring Agreement E is ambiguous, such ambiguity should be construed against the insurer under the doctrine of *contra proferentem*. *See National Screen Service Corp. v. United States Fidelity & Guaranty Corp.*, 364 F.2d 275, 279 (2d Cir.), *cert. denied*, 385 U.S. 958, 87 S.Ct. 394, 17 L.Ed.2d 304 (1966).[4]

In opinions relied on by the plaintiff, two different state courts construed Insuring Agreement E or a like provision narrowly holding that the plaintiff's loss was not caused by the forged documents; instead, these courts held, the loss was due to a bad business deal or credit risk. *See Allen State Bank v. Traveler's Indemnity Co.*,

---

**4.** The rule of *contra proferentem* is not applicable in this case because it is only employed to resolve ambiguity after all other aids to construction are exhausted. *See Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 10 n. 2 (2d Cir.1983).

270 So.2d 270, 273 (La.App.1972); *Texas National Bank v. Fidelity and Deposit Co.*, 526 S.W.2d 770, 774 (Tex.Civ.App. 1975). In *Allen State Bank*, after the initial loans were made, the bank accepted, as collateral, promissory notes which proved to be fictitious. The court noted that the bank "gave nothing of value and extended no credit or in fact did anything referred to in coverage (E) predicated upon the fifty-one promissory notes...." 270 So.2d at 273. Thus, the court held that "[t]he bond is not a policy of credit insurance and does not protect the bank when it simply makes a bad business deal. The real cause of the loss ... in this case was [the debtor's] failure to repay the loan and not any fraud perpetrated on the bank at the time the loan was made." *Id.*

In *Baltimore Bank & Trust Co. v. United States Fidelity & Guaranty Co.*, 436 F.2d 743 (8th Cir.1971), however, the opposite result was reached. There, the bank sought to recover for its loss on a loan sustained by reason of its acceptance in connection with the loan of a promissory note later determined to be fictitious. The bank's lawsuit was based on Insuring Agreement E.[5] The bank customer, over the course of one month, made deposits to his checking account totalling approximately $150,000 and wrote checks for approximately the same amount. Several of the checks which he deposited were later returned to the bank unpaid. As a result, the customer's account became overdrawn in the amount of approximately $40,000. The customer, being unable to reimburse the bank for the deficiency, obtained two loans from the bank to cover it. One loan, obtained in March for approximately $31,000, was based on a 30-day promissory note. A second loan, obtained in April in the amount of approximately $8,000, was secured by a pledge of 50 shares of stock in a company substantially controlled by the

customer. After being pressed to repay the loan but being unable to do so, the customer was permitted by plaintiff to "replace or pay off" the loans with two new notes supported by different collateral. The security for the prior notes was returned to the bank customer. Some of the new collateral in the form of promissory notes turned out to be forgeries. *Id.* at 745.

The Eighth Circuit, affirming the District Court's grant of summary judgment to the bank, reasoned that the "effect of the transaction was to pay off the original notes by giving two new notes secured by different collateral. The transaction was in the nature of a novation and it was the substitution of a new legal obligation for an old one." *Id.* at 746. The Court held that the Insuring Agreement should be construed broadly and in favor of the insured and noted that the term "'blanket bond' indicates wide coverage." *Id.* The Court also noted that even if the debt were considered pre-existing, the bank's acceptance of the fictitious notes is nevertheless the extension of value within the meaning of the Uniform Commercial Code § 3–303. *Id.*

Fireman's argues that the holding in *Baltimore Bank & Trust Co.* does not apply because a novation did not occur when the plaintiff accepted the fictitious bills of lading since at all times the plaintiff reserved the right to call the entire debt into default. A novation is the "[s]ubstitution of [a] new contract between [the] same or different parties." Black's Law Dictionary 959 (5th ed. 1979). The elements of novation are "(1) a previously valid obligation; (2) an agreement of all parties to the new contract; (3) extinguishment of the old contract; and (4) a valid new contract supported by consideration." *See VJK*

**5.** At the time of the *Baltimore Bank & Trust Co.* case, Insuring Agreement E provided coverage for losses occurring "through" rather than "resulting directly from" the insured's having acted upon a forged or counterfeit security or document of title. "Through" has been defined as "by means of, in consequence of, by reasons of, by the intermediary of, and because of." *See Texas National Bank,* 526 S.W.2d at 774 (citation omitted). "Resulting directly from" is not sufficiently dissimilar to provide a basis upon which to distinguish *Baltimore Bank & Trust Co.* from the instant situation.

*Productions, Inc. v. Friedman Meyer Productions, Inc.*, 565 F.Supp. 916, 921 (S.D. N.Y.1983). Whether a novation has in fact occurred is a factual question the resolution of which depends on all the circumstances. *See Capital National Bank v. Hutchinson*, 435 F.2d 46, 50 (5th Cir.1970).

■ Three of the fictitious bills of lading received by FABC were delivered on December 31, 1982, in return for which the plaintiff credited the demand account of Colombian Coffee in the amount of $650,-000. The $650,000 credit had its origins in FABC's agreement on December 22, 1982 to provide $1.3 million in financing to Colombian, which agreement never came to fruition due to Colombian's tender of nonconforming bills of lading. However, FABC ultimately did loan Colombian $650,-000 against the three bills of lading in order to cover a check delivered to Societe Generale. The three bills of lading, with a stated value of $824,000, were pledged on December 31, 1982 to secure the loan for $650,000 made on January 3, 1983. I conclude that with respect to the three bills of lading received on December 31, 1982, plaintiff's loss would appear to be covered by the blanket bond issued by Fireman's. FABC's loss resulted directly from FABC having, in good faith, "given value, extended credit or assumed liability, on the faith of, or otherwise acted upon" its receipt of the three bills of lading.

With respect to the seven bills of lading received in November of 1982, FABC has not suffered a loss because Colombian satisfied its $2 million debt to FABC out of the $3 million loaned in January of 1983. However, if under all the facts, it is determined that no novation occurred in January, then it may well be that plaintiff can recover under the bond for any loss resulting from its receipt in November of the seven bills of lading.

The loan made on January 17, 1983 was made with the understanding that Colombian, which was in the process of reducing its indebtedness to FABC, would use two of the three million dollars to repay the $2 million unsecured loan made in November.

Arguably, FABC's loss directly resulted from its receipt of the bills of lading if, in fact, it failed to pursue General Coffee on the $2 million check returned for insufficient funds in reliance on its receipt of apparently genuine bills of lading or if it is ultimately determined that a novation occurred on January 18, 1983. In either case, FABC's loss may be brought within the purview of Clause E to the Banker's Blanket Bond.

Thus, as to the $650,000 advanced on January 3, 1983 and the $1 million advanced on January 18, 1983, FABC clearly gave new value on the faith of written instruments which proved to be fictitious. A question remains, however, as to whether FABC extended credit or value to Colombian or "otherwise acted upon" its receipt of the bills of lading when it advanced Colombian $2 million on January 18, 1983. If not, then factual issues surrounding the November transaction will require resolution.

## II.

Fireman's argues also that FABC did not rely in good faith upon the bills of lading. Clause E provides that in order for FABC's loss to be covered by the Banker's Blanket Bond, it must result "directly from the Insured having, *in good faith*," relied on the documents of title it received. *See Marsh Investment Corp. v. Langford*, 554 F.Supp. 800, 806 (E.D.La.1982) ("selective, calculated ignorance" shows a lack of good faith reliance), *aff'd in part and vacated in part*, 721 F.2d 1011 (5th Cir.1983).

Fireman's asserts that FABC had a duty to inquire into the genuiness of the bills of lading because plaintiff's receipt of the documents was not a part of an "arms-length financing of coffee imports." It appears to be undisputed that FABC did not attempt to present the bills of lading at the port of destination or retain a shipping agency to do so. Similarly, FABC did not make inquiries or seek information relating to the coffee shipments supposedly represented by the bills of lading. Fireman's cites to the overall financial instability of Colombi-

an at or about the time of the loans as further support for its proposition that FABC had a duty of inquiry which it breached. By way of explanation for FABC's inaction, Fireman's argues that FABC already suffered its loss and therefore had nothing to lose by accepting the bills of lading.

Good faith has been defined in the Uniform Commercial Code § 1–201(19) as meaning "honesty in fact in the conduct of transaction concerned." *See Chemical Bank v. Haskell*, 51 N.Y.2d 85, 91–92, 411 N.E.2d 1339, 432 N.Y.S.2d 478 (1980) (subjective good faith test). Summary judgment is generally inappropriate when the outstanding issue or question involves intent or motive. *See Landmark Land Co. v. Sprague*, 701 F.2d 1065, 1070 (2d Cir. 1983). Under the circumstances of this case, factual issues clearly remain as to FABC's motive. As plaintiff notes, several banks in addition to FABC accepted fictitious bills of lading in connection with loans made to Colombian.

■ Contrary to Fireman's argument, FABC did not necessarily act in bad faith when it extended credit to Colombian despite Colombian's diversion of funds to Colombia. Given the history of a banking relationship between FABC and Colombian and the reduction of Colombian's indebtedness to FABC, it may not have been imprudent for FABC to extend Colombian further financing. In addition, it appears that after learning of the diversion, FABC initiated an inquiry into the business of the Duque family and was reassured of their good reputation and importance in Colombia. *See* Affidavit of Rodrigo Munoz at 8. I note also that after learning of the diversion and faced with a commercial decision similar to that faced by FABC, other banks loaned Colombian additional amounts.

On the whole, then, Fireman's has not made a showing sufficient to raise any doubts as to FABC's good faith. In fact, on the balance, from the parties' submissions, it would appear that FABC did not have reason to be and in fact was not suspicious of the genuiness of the bills of lading.

With respect to FABC's actions once it received the bills of lading, I reject Fireman's offer as evidence that FABC acted in bad faith the fact that FABC held the bills of lading for several months. First, holding the bills of lading is irrelevant to the issue of whether FABC acted in good faith when it agreed to provide financing based on the bills of lading. Second, as FABC suggests, the use of guarantees obviates the need for simultaneous surrender of the bills of lading upon delivery of the goods. Finally, Fireman's does not suggest, and it is unlikely the case, that the reasonable commercial practice requires an inquiry into the genuiness of the bills of lading or the shipment that the bills purportedly represent. Accordingly, Fireman's motion for summary judgment dismissing plaintiff's claims against Fireman's on the Banker's Blanket Bond is denied.

### B. FABC's Claim of Bad Faith

In its "Eighth Claim, Against Fireman's," FABC alleges that Fireman's breached its implied obligation to conduct itself in good faith toward the plaintiff by failing to promptly consider plaintiff's claim and by making excessive demands for documentation in support of plaintiff's claim after concluding to deny plaintiff's claim. Fireman's moves pursuant to Fed. R.Civ.P. 12(b)(6) and 56(b) to dismiss the Eighth Claim.

■ In order to establish bad faith on the part of the insurer, an "extraordinary showing of a disingenuous or dishonest failure to carry out a contract" must be demonstrated. *See Gordon v. Nationwide Mutual Insurance Co.*, 30 N.Y.2d 427, 285 N.E.2d 849, 334 N.Y.S.2d 601, 609 (1972), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973). FABC discovered its loss on May 13, 1983 and notified Fireman's of its loss on May 19, 1983. Its proof of loss was filed on August 10, 1983 and by letter dated September 28, 1983, counsel for plaintiff requested that Fireman's indicate its position on coverage. By letter dated December 2, 1983, Fireman's

indicated to plaintiff's counsel that it could not acknowledge plaintiff's right to recovery under the terms of the bond. Plaintiff asserts that Fireman's reached this conclusion prior to its December 2, 1983 letter but failed to so inform plaintiff.

With the standard governing summary judgment motions and the nature of contractual bad faith claims in mind, I conclude, after reviewing the relevant affidavits and documents that there is no factual basis to support plaintiff's contention that the requested documentation was frivolously sought or unnecessary or that Fireman's was dilatory in informing plaintiff of its decision on coverage. Fireman's motion is granted and plaintiff's Eighth Claim is dismissed.

Accordingly, Fireman's motion for summary judgment is denied but its motion to dismiss plaintiff's Eighth Claim, against Fireman's alleging bad faith, is granted.

SO ORDERED.